# CHARLESTON.

CHAPMAN et als v. MILL CREEK COAL & COKE COMPANY et al.

Submitted February 4, 1903.    Decided November 28, 1903.

54 193
59 208

54    193
e63   226

54     193
f65    633

DEED—*Construction—Reservation.*

     C. and H. conveyed to P. 925 acres of land by deed in which there is this language, after the granting clause: "Excepting always that the parties of the first part hereby expressly reserve to themselves, their heirs and assigns forever, the use and occupancy of any one of the coal banks on said land, that they may at any time hereafter, or that either of them or their heirs or assigns may jointly or severally select, together with right of way for ingress and egress to and from same." There are six separate coal veins underlying the land. The heirs of the said grantors instituted their action of ejectment to recover one of said coal veins or seams, designating it, and claiming under said exception or reservation, from the defendants, who claim title to all the coal under the deed to P. *Held*: That such deed does not reserve the title to said coal, or to any part thereof; and that said reservation or exception will not support an action of ejectment for said coal. (p. 201).

Error to Circuit Court, Mercer County.

Action by A. A. Chapman and others against the Mill Creek Coal & Coke Company and others. Judgment for defendants, and plaintiffs bring error.

                                     *Affirmed.*

C. W. SMITH, C. R. McNUTT and JOHN OSBORNE, for plaintiffs in error.

A. W. REYNOLDS and J. S. CLARK, for defendants in error.

MILLER, JUDGE:

By grant bearing date on the 1st day of July, 1851, there was granted by the Commonwealth of Virginia, to David Hall and Henly Chapman, a tract of land containing 1,750 acres, lying in the counties of Mercer and Tazewell, the greater part thereof being in Mercer. The boundaries are set out in the grant.

On the 5th day of April, 1856, Hall and wife, and Chapman, by their deed, granted to David K. Perdue, for the consideration of $307.75, that part of said tract lying in the county of

Mercer containing about 925 acres, described in the deed by metes and bounds. The deed contains the following exception or reservation: "Excepting always that the parties of the first part hereby expressly reserve to themselves, their heirs and assigns forever the use and occupancy of any one of the coal banks on said land that they may at any time hereafter or that either of them or their heirs or assigns may jointly or severally select together with right of way for ingress and egress to and from same, and the said parties of the first part for themselves, their heirs, etc., hereby alien and convey to the said party of the second part, all the right, title and interest which they acquired in and to the said parcel of 925 acres of land by virtue of their grant as aforesaid; and they will warrant and defend the title to the same, with the reservation as aforesaid, against all persons claiming by, through or under them, and from none else."

At the October Rules, 1893, A. A. Chapman, Charles T. Painter, S. W. Nowlin, and sixty-five others, filed their declaration in ejectment in the clerk's office of the circuit court of Mercer County against the defendant, Mill Creek Coal and Coke Company, a corporation, alleging therein, that, "on the 1st day of May, 1893, the said plaintiffs were possessed in fee of a certain coal bank or coal seam, known as vein or seam number 3, in a certain parcel or tract of land, lying and being mainly in the said county of Mercer and State of West Virginia, containing nine hundred and twenty-five acres being the same land conveyed by Henly Chapman and David Hall to David K. Perdue by deed dated April 5, in the year 1856." The metes and bounds as in said deed were then set out.

Afterwards, on the 24th day of February, 1894, by order of the Court, E. W. Clark, H. M. Bell, and Joseph I. Doran, trustees of the Flat Top Coal Land Association, lanlords of the defendant, were made defendants with the said Mill Creek Coal and Coke Company.

After sundry orders had been made from time to time in the action, the defendants, at the May. term, 1902, entered their plea of not guilty, and issue being joined, a jury was selected and sworn to try the same. At the close of plaintiff's evidence in chief, it was all stricken out by the court on motion of defendants. The plaintiffs then declining to take a non-suit, the jury being instructed by the court so to do, found a verdict for

the defendants, to which the plaintiffs excepted and moved the court to set it aside and to grant them a new trial. This motion being also refused by the court, the plaintiffs again excepted, and the court then rendered judgment against them on the verdict. All of the evidence introduced on the trial is certified in a bill of exceptions and is a part of the record.

To the judgment aforesaid, plaintiffs obtained a writ of error and *supersedeas*, and say, for assignment of error, that the verdict aforesaid is contrary to the law and the evidence; that it was error to exclude plaintiffs' evidence from the jury and direct the jury to find for defendants; and that the refusal of the court to set aside the verdict and grant plaintiff a new trial,' was also error.

Plaintiffs are the descendants and heirs at law of grantors Hall and Chapman, and claim the said coal bank or coal seam by virtue of the reservation in the deed as aforesaid. The defendants claim under said deed, and contend that the reservation therein was and is void for uncertainty, and because it infringes the rule against perpetuities; that the right of selecting a "coal bank," reserved to the grantors in the deed to Perdue, could be exercised by the grantors only, and did not survive them; that the right reserved to select a "coal bank" does not give the right to select a coal vein; that the right reserved as aforesaid is not sufficient to support an action of ejectment; and that, if the said reservation is a vested interest in the land, it has been forfeited to the State, for non-entry and non-payment of taxes thereon, according to law.

For the purposes of its consideration, it is immaterial whether that part of the deed of Hall and Chapman to Perdue, upon which plaintiffs predicate their action, is called an exception or reservation. Technically, they are different in meaning, but have often been used as synonymous. "Though apt words of reservation be used they will be construed as an exception, if such was the design of the parties." *Kister* v. *Reeser,* 98 Pa. 1.

In order to determine the questions raised, it is necessary, first, to ascertain the meaning of the words employed by the parties to the deed. In doing so, we must take the language used, most strongly against the grantors. Hammon on Contracts states the following rules for the construction of deeds and other

written instruments: "Ambiguous words are to be taken most strongly against the person using them. Section 413, and cases cited. * * * This rule is applied to exceptions and provisos in deeds. They are taken most favorably to the grantee. *Id. note* 132. * * * Conditions, exceptions, reservations, and provisos are to be strictly construed against the person in whose favor they are introduced; nor will the law permit a thing which is expressly granted, covenanted, or promised to be defeated by the subsequent restrictions. Section 411. * * * * Contemporaneous construction of a contract is that drawn from the time when, and the circumstances under which, the contract originated. It is of great weight in determining the intent of the parties. * * * And the state of the country and of the manners of society at the time the contract was made is also to be regarded in giving it a construction." Section 398. These principles are supported by *Hurst* v. *Hurst,* 7 W. Va. 299 ; *Gibney* v. *Fitzsimmons,* 45 W. Va. 342.

The foregoing rules will now be applied to the deed in question. The word "bank" is defined in standard dictionaries as "the face of a coal vein in process of being mined ;" "the surface immediately about the mouth of a mine ;" also "to form, or lie in banks." In geology a thin layer or stratum or rock is called a seam. The same term is applied to coal. Vein of coal, coal bed, and coal seam are used as equivalent terms.

In 1856, when the deed to Perdue was executed, that section of country, in which the land in question lies, was almost an uninhabited wilderness. So far as this record discloses, there was but one family living near the land. There were no roads to it. As a witness describes it, "there was nothing but cow paths. There was at that time an opening in the land, from which coal was taken for blacksmithing purposes." Another witness says, "they just cut it out, (the coal) with a mattock or something like that. There was no place in under the ground at all, at the time, and I don't suppose that there was anybody in the county that would have gone under the ground ten feet then. They carried the coal away on their shoulders through bushes and brush. There was no use made of coal in that part of the county then except by blacksmiths." He further states that he never knew anybody at that time to go there, (to the place of getting coal,) with a horse or wagon; that the coal could not

have been taken in that way; that there was a path which crossed the ridge between a quarter and a half mile from the coal opening; that it wasn't much more than a path, because there was at that time very few people there to use it (the path); and it was used only for going to mill and such things."

It is fair to presume that coal in that section at that time had no commercial value; and that no person then knew the land was underlaid with the deposits of coal which have since been discovered. Certainly the parties to the deed did not expect the mining devolpments and great increase in the value of coal and coal lands in that section of the State, which have taken place since that time.

It appears that six veins of coal underlie the land in controversy. Since the coal developments in that region, those veins have been numbered, and are known as "Coal veins" Nos. 1, 2, 3, 4, 5, and 6, respectively, the lowest one being No. 1, the highest No. 6. No. 2 is about forty feet below No. 3, and is thirty to thirty-six inches in thickness. No. 1 is fifty to sixty feet below No. 2. No. 6 is from one hundred and fifty to one hundred and seventy-five feet above No. 3, and is between three and four feet in thickness. The thickness of vein No. 3, the one in controversy, is from seven and one half, to eight feet.

Of the tract of 1,750 acres, Hall and Chapman conveyed 925, and retained 825, acres. They also expressly reserved to themselves, their heirs and assigns *forever,* the use and occupancy of any of the coal banks on said land (conveyed) which they might at any time thereafter, or that either of them, or their heirs or assigns, might jointly, or severally, select, together with the right of way for ingress and egress to and from the bank so selected.

The exception for the use and occupancy of the coal bank and for the right of way, are in one sentence. "By the term, 'right of way,' is generally meant a private way which is an incorporeal hereditament of that class of easements in which a particular person or particular description of persons, have an interest and a right, though another person is the owner of the fee of the land, in which it is claimed." Angell on Highways, 3 Ed. section 1. According to this author, the exception as to the "right of way," reserves an incorporeal hereditament only and not the title to any

portion of the land. Again, this clause reserves "the right of way for ingress and egress to and from" the coal bank which might be so selected.

This language certainly does not confer upon the grantors, or those who claim under them, the right to pass over the tract of land, to the several openings of the various mines which might be necessary for the purpose of mining coal vein No. 3. It is shown that it would be impracticable to mine all of the coal in that vein from one opening.

Does this clause in the deed retain in the grantors the title to any coal, and, if so, to how much? If it reserves to the grantors the title to any one of the coal veins, or coal beds on the land, it reserves the title to all. The selection was to be made in the future, and, on this theory, when the selection was made, if ever, the title to the coal veins not selected, remained in the grantors, their heirs or assigns, because "no estate of inheritance or freehold, or for a term of more than five years, shall be conveyed unless by deed or will." Code, chapter 71, section 1; Code of Va. 1860, chapter 116, section 1. If under the deed, the title to the coal passed to Perdue, he or his assigns for the same reason, held the title after the selection was made by the heirs of Hall and Chapman.

In *United States v. Grundy,* 3 Cranch, 337, 352, the court says: "It seems to be the very nature of a right to elect one of two things, that actual ownership is not acquired in either until it be elected, and if the penalty of an offense be not the positive forfeiture of a particular thing, but one of two things, at the choice of the person claiming the forfeiture, it would seem to be altering materially the situation in which that person is placed to say that either is vested in him before he makes that choice. If both are vested in him, it is not an election, which to take, but which to reject. It is not a forfeiture of one, of two things, but a forfeiture of two things, of which one only can be retained."

In *Sir Rowland Heyward's* Case, 2 Coke, 35a, it is held that: "If I have three horses, and I give you one of my horses; in this case, the election ought to be made in the lifetime of the parties, for inasmuch as one of the horses is given in certainty, the *certainty and thereby the property begins by election.*"

If we hold that the title to the coal beds or any of them remained in Hall and Chapman, their heirs or assigns, until the

reserved right of election was exercised, it follows that the deed
to Perdue, was and is, in effect, nugatory, as to the coal under-
lying the land, because grantee could not lawfully sell or use it,
until the reserved interest was definitely ascertained, which
might not be done within a hundred years or more.  "A deed
should be considered as intended to have some effect, and a con-
struction making it operative will be preferred to one rendering
it void.  Some effect will, if possible, be given to the instrument,
for it will not be intended that the parties meant it to be a nul-
lity."  Devlin on Deeds, Vol. 2. section 850. ·

If grantors reserved the title to the coal, or any part there-
of, neither Perdue nor his assigns could maintain an action
against a person for the digging or removal thereof from any
of the veins, until after a selection as aforesaid.  The lien of a
judgment against Perdue, or his heirs or assigns, would not
have attached to any of the coal.  "The lien of a judgment at-
taches to the precise interest or estate which the judgment deb-
tor has, actually and effectively, in the land."  Black on Judg.
section 420; *Marshall's exr.* v. *Hall,* 42 W. Va. 641; *Cleavenger*
v. *Felton,* 46 W. Va. 249.

Henly Chapman one of the grantees, died in April, 1864, and
David Hall, the other, died in Indiana in 1867.  Their heirs
and claimants under them, at the time of the trial of the ac-
tion, resided in Arkansas, Idaho, Kansas, Missouri, West Vir-
ginia, and other sections of the country. The Hall heirs were
represented by their agent and attorney in fact, D. H. Torbett,
a grandson of David Hall.  The grantors in the deed, before
their deaths, and their heirs, at different times, had removed
from the section of country in which the land is situated, seem-
ingly leaving no interests behind them.  Thirty-seven years had
elapsed after the execution of the deed before their action of
ejectment was commenced.  The marvelous developments of the
last twenty-five years in Mercer and adjoining counties had
made the coal underlying that tract of land immensely valuable.
Vein No. 3 the most valuable of the six had been opened, and in
1893, was being mined by persons holding under the title con-
veyed to Perdue.  Plaintiffs then, for the first time, sought to
make their selection, under the reservation in the deed; selected
No. 3 as the "Coal Bank" referred to in the deed;  and com-
menced their aforesaid action for its recovery.  These are cir-

cumstances against the contention of plaintiffs that they have a vested right in the land, the coal in place being a part of the freehold. "Tell me," said Lord Chancellor Sugden, "what you have done under such deed, and I will tell you what the deed means." *Caperton's Admr.* v. *Caperton's Heirs,* 36 W. Va. 486, and authorities there cited. Plaintiffs' action is brought on the assumption that Hall and Chapman reserved the title to this coal vein, and that the title thereto descended to them. If we adopt this construction of the reservation in the deed, we must say that instead of a reserved right of selection, the grantors, and their heirs, had and have the right of rejection of five of the six coal veins. But the language is, "excepting always that the parties of the first part hereby expressly reserve to themselves their heirs and assigns forever, the use and occupancy of any one of the coal banks on said land that they may at any time hereafter * * * select," etc.

This language imports a future selection and does not indicate an intention of the grantors to hold the effect and operation of the deed in abeyance. To select is to make choice of that which is most desirable or suitable. Selection does not carry with it the idea of ownership until the selection be made. The customer selects the article desired from the stock of the merchant. The settler selects and takes up a parcel of land from the public domain, under the provisions of the Land Act.

Plaintiffs cite numerous authorities to support their contention, among which is *Mapel* v. *John,* 42 W. Va. 30. In the opinion at page 37, JUDGE HOLT says: "This brings us to the evidence. Joshua M. Ross sold and conveyed to Jesse Everly, by deed dated 16th February, 1860, the land now owned by plaintiff, Mapel. In it he makes this reservation: 'The said Ross excepts the privilege of coal for his part of the farm at the bank now in use.' What Ross did not then sell, which he calls ' his part of the farm,' is the land now owned by defendant, John. As to the nature and extent of defendants right to mine coal on plaintiff's land, it is enough for our present purpose to say that the privilege to mine coal at the bank then in use was an easement annexed to defendant's land, the dominant tenement, to mine coal at that open mine on plaintiff's land, the servient tenement, which was only a privilege to take coal at a particular place for a particular purpose;" etc. We do not think

that this case adds any strength to the contention of the plaintiffs.

Testing the language of the reservation in the deed, by the rules above laid down, and giving due consideration to the time when, and the circumstances under which the deed was executed, our conclusion is that Hall and Chapman did not, in and by said deed, reserve to themselves, their heirs or assigns, the title to the coal, or any part thereof, underlying the said nine hundred and twenty-five acre tract of land. We are further of opinion that the exception in the deed, if good for any purpose, reserved only the right to take coal for the purposes for which it was then used in that section from any of the coal veins on the said conveyed tract of land, to be selected by the persons mentioned in the deed; and that the terms, use and occupancy of any one of the coal banks on said land, must be restricted to the purpose of digging and removal of coal for the purposes aforesaid.

It follows, therefore, that the said action of ejectment cannot be successfully maintained. In *Witten* v. *St. Clair*, 27 W. Va. 770, 771, the Court, by JUDGE SNYDER, says: "Accordingly in order to enable the plaintiff to sustain this action it is essential that he be clothed with the legal title and the right of possession at the time the action is instituted. The plaintiff must always in the first instance make out a legal and possessory title to the premises in controversy, and the defendant's evidence may be confined to the falsifying his adversary's proofs, or rebutting the presumptions which may arise from them." See also *Suttle* v. *Railroad Co.*, 76 Va. 284; 18 L. R. A. 781; Am. & Eng. Enc. Law, 2 Ed. Vol. 10, 482; Waits' Actions and Defenses, Vol 3, p. 10. A plaintiff in ejectment must at the time of instituting his action, and at the time of its trial, have a legal title to the land he sues for. Am. Dig. Cent. Ed. Vol 17, 1960.

In Pennsylvania, where great latitude obtains, there being no courts of chancery, it has been held that ejectment is almost the only action for trying title to land. "But the action will not lie for a mere privilege, or incorporeal hereditament. The general rule is recognized in Pennsylvania, as elsewhere, that ejectment will only lie for things whereof possession may be delivered by the sheriff. The case of common appendant or ap-

purtenant is said to be in some degree an exception; but then the officer, by giving possession of the land, gives possession of the common." Tyler on Eject & Ad. Enjoy. 59. On page 37, the same author says: "By the common law, and the general rule, an ejectment will not lie for anything wherever an entry cannot be made, or of which the sheriff cannot deliver possession. It would follow, therefore, by this rule, that ejectment is only maintainable for corporeal hereditaments." "Ejectment will not lie for an incorporeal hereditament." Am. Dig. Cent. Ed. Vol. 17, 1954.

The exception in the deed, being a privilege only, as the right to take water from a spring, or of watering stock at a stream on the lands of another, is an incorporeal hereditament, for which the action of ejectment will not lie. A decision of the other questions presented is therefore unnecessary.

For the foregoing reasons, there is no error in the judgment complained of. It must be affirmed.

*Affirmed.*

POFFENBARGER, JUDGE, (*dissenting*):

Being of the opinion that the exception contained in the deed, though in form a reservation, does not lack that certainty which is necessary to vest a title, and that, by its express terms, it carries an interest in, and not a mere right to do something upon, the land, I am compelled to dissent from the conclusion to which my associates have come.

This is not a case in which a choice to take one of several different things is reserved or granted. It is an express exception, which is practically the same thing as a grant, of an interest in one thing which is made certain by the description found in the deed. That one thing is the tract of land. The only question left for determination is the extent of the interest excepted, or the particular designation of the part excepted. Nobody could hesitate in saying that it was competent for the grantors to reserve to themselves all the coal in the tract of land granted. Having the power to reserve all, can it be said that they had not the power to reserve part of the same thing? The case of the *United States* v. *Grundy,* 3 Cranch 337, and the hypothetical case put in *Sir Rowland Hayward's Case,* 2 Coke 359, illustrate an entirely different proposition from the one involved

here. In the former, the United States had the right to elect whether it would take a ship itself or the value of that ship in money to be recovered of the owner. The ship and the money were two separate and distinct entities or things. Until the choice was made, it was left wholly uncertain as to which of those things would be taken. There was uncertainty of the thing in which the interest would be taken. The statute did not provide that the government should have an interest in one certain thing, leaving the extent of that interest to be determined by election, but said that the government should have, by reason of the forfeirute or violation of the statute, an interest in one thing or an interest in another thing, as it might elect, without saying in which thing it should have an interest. There was no uncertainty of any kind whatever. Hence, no title could pass or vest until the entity in which it was to vest was indicated and made certain by the election. The instance of giving one of three horses is of the same kind. If the gift had been of a one-fourth or a one-half interest, according to the election of the donee, in that certain white horse called "John," an interest would have passed and vested at once. Nothing would have remained unsettled, except the extent of that interest, and the mode of making that certain, would have been expressly stated in the declaration of gift. The specific piece of property in which the interest is given is, in such case, designated, pointed out and made absolutely certain. So, in this case, a tract of land is described by metes and bounds, located and identified to an absolute certainty, and then the deed says one of the coal banks, to be selected by the grantors, is reserved and excepted from the conveyance. That coal bank is a part of the one thing conveyed, and is not a separate and distinct entity. All six of the coal veins and the strata of stone between them, and the earth on top, and all that lies below, constitute the thing identified and passed by that deed in which an interest is reserved. The only matter left open is the amount of the interest, and the means of ascertaining that are specified in the deed. That is certain which can be made certain. Suppose it had been the conveyance of one hundred acres of land, excepting therefrom one acre, or ten acres, to be selected by the grantor. Would that have been void for uncertainty? By no means.

"If a man grants twenty acres, parcel of his manor, without any other description of them; yet the grant is not void, for an acre is a thing certain, and the situation may be reduced to a certainty by the election of the grantee." 3 Bac. Abr. 307. "So, if one being seized of a great waste grants the moiety of a yardland lying in the waste, without ascertaining what part, or the special name of the land, or how bounded; this may be reduced to a certainty by the election of the grantee." *Id.* "When one and the same thing passeth to the donee or grantee, and the donee or grantee hath election in what manner or degree he will take this; there the interest passeth immediately, and the party, his heirs or executors, may make election when they will." *Id.* 311.

"And it was said, if a man gives two acres to another, *habendum* one acre to him in fee, and the other acre to him in tail, and he aliens both, and hath issue, and dies; in this case, the issue may bring a *formedon in discender* for which acre he will, *for the election is not determined by his death; for an estate passes presently by the livery, and the issue shall take by descent.*" *Sir Rowland Heyward's Case,* 2 Co. 35a, 37a. At the same page, Lord Coke says: "When nothing passeth to the feoffee or grantee before the election, to have one thing or the other, there the election ought to be made in the life of the parties, and the heir or executor cannot make the election. But when an estate or interest passeth presently to the feoffee, donee, or grantee, there election may be made by them, or by their heirs or executors. *When a thing passeth to the donee, or grantee and the donee or grantee hath election in what manner or degree he will take it, there the interest passeth presently, and the party, his heirs or executors, may make election when they will.*"

This principle was applied in *Anderson* v. *Donelson's Exrs.,* I Yerg. (Tenn.) 197, under the following conditions: Anderson had covenanted to convey to Donelson seven hundred acres of land to be selected in a square or oblong out of any one of the four corners of a large tract. After Donelson's death, his executor selected the land and Anderson refused to convey it. Thereupon an action was brought on the covenants. In deciding the case, the judge quoted and applied a part of the language above quoted from Lord Coke, and then said: "It is a

simple title bond for 700 acres of land out of a five thousand acre tract, making Donelson in equity, a tenant in common with Anderson, in proportion as the 700 acres are to the whole tract, and the option spoken of in the bond, refers alone to the mode of partition, which Donelson reserved the right to control to a certain extent."

This is not an exceptional case. A great many others so hold in several different states, some of which are cited in support of the following text, found in 17 Am. & Eng. Enc. Law 2 Ed. 663 : "Where a conveyance is made of a certain number of acres of a tract of land, not described by metes and bounds, the grantee becomes a tenant in common with the grantor or the other owners, where the land is held in common, of the entire property, the extent of his interest being determined by the proportion which the number of acres conveyed bears to the number of acres in the entire tract."

These decisions have settled what, in early times, was an open question, namely, whether in such case, there was a tenancy in common. "Upon a covenant, in consideration of marriage, to stand seized of so much land as shall be of the yearly value of forty marks; it hath been a question, whether they to whom the assurance was made, might enter into any part of the land of the value of forty marks, at their election, and hold the same in severalty; or if they should be only tenants in common with the other; and whether they may choose one acre in one place, and one acre in another; and so through the whole land where they please." 3 Bac. Abr. 307, 308. The question was what the relation between the parties should be, but no doubt was expressed that an interest attached and passed by such a covenant, although far more uncertain in its nature than that which is excepted here by the clause in question.

As the relation of co-tenancy in the land is credited by this exception, it was in the power of Perdue, the grantee, or any person claiming under him, to compel, at any time, an election on the part of the grantors or their heirs, just as in any other case. One co-tenant may, by a proceeding for partition, have his interest set apart for his separate use and enjoyment.

Before the statute, authorizing conveyances of land by deed, without livery of seizin, this exception could hardly have been made, and if it could have been made, it would have failed, if

the election were not made within the life time of the party in whose favor it was made. A man could not make a feoffment to commence after his own death, for estates of freehold could not be made to commence *in futuro.* 4 Bac. Abr. 203, 204. Neither could a man reserve to himself a life estate. *Id.* 204. There is another reason why, under a feoffment, it was necessary that the election be made in the life time of the feoffee. The delivery of possession of the land was necessary to the completion of the transfer of title. Lands could only pass by livery of seizin, and livery of seizin was delivery of the possession. Anciently, this was done without any writing, but later a charter or deed accompanied it as evidence thereof, but the delivery of the possession continued to be the essential part of the transaction. Where the livery was in deed, both parties went upon the land, and when the conveyance was by livery within view or livery in law, title did not vest in the feoffee until he entered upon the land. Until entry, the livery operated as a license to take possession for the purpose of completing title, and, if the feoffee died before entering, his heirs could not enter, 4 Bac. Abr. 200, 202. As lands now pass by grant, and estates may be so created to commence *in futuro,* these old principles do not apply, and election is not necessary to the completion of title. Entry upon the land is no longer required. Therefore, *Bullock's Case,* cited in *Sir Rowland Heyward's Case,* is not applicable. That was a feoffment of a house and seventeen acres of land out of a large tract and the land was not selected and entered upon by the feoffee in his life time.

Nor do I think the exception can be limited to the creation of a mere incorporeal hereditament, the mere right to go upon the land and dig and carry away, in common with the other owners, coal. The exception is of the use and occupation of the coal bank. Occupancy, when applied to real estate, implies an estate in the land. An occupant of land is a tenant or an owner. If he occupies at the will of the owner, he has an estate at will or at sufferance; if for a period of years, an estate for years, if for a life time or any greater period, he has an estate of freehold. The mere right to go upon land and do certain acts, such as to take away the wood or coal, is not an estate in the land of any kind or character. Certain grants or reservations, in re-

spect to coal, have been held by the Pennsylvania courts to create mere incorporeal hereditaments, and not to pass any interest in the land. But, in most of these instances, the instrument disclosed upon its face the intent to pass nothing more than a mere right to dig and carry away coal, not all the coal, but some of the coal, the grantor reserving the right to dig and carry away from the same seam or mine also. One case may be said to be somewhat similar to this. The instrument conferred the "free right to dig coal at the coal bed under my lot— with the privilege freely to carry the coal from the said lot, as also free ingress and egress to and from said coal bed through my land at all times hereafter, doing as little damages as may be in the uses, etc." *Gloninger* v. *Coal Co.,* 55 Pa. 9. That deed expressly gave the right to dig and carry away coal. It did not give in express terms the use and occupation of the coal bank, as the reservation here does. There is no escape from the conclusion that this passes an interest in the coal, except by resorting to construction, so as to narrow these terms and make them mean less than the words used technically and ordinarily mean.

*Rex* v. *Inhabitants of Eatington,* 4 T. R. 178, holds that, "If A. residing in a cottage of his own grant it by lease and release to B. in fee, in consideration of £361, with a proviso 'that A. shall live in and occupy the said cottage with the appurtenances as he theretofore had done and then did for life;' B. only takes an estate for life in A." Lord Kenyon said: "If this question had depended on the first words in the proviso, I should have thought that they would have been satisfied by determining that only a liberty to inhabit the cottage was reserved to the father; but the word 'occupy' carries the interest reserved still farther, and shows that the whole estate was intended to be reserved to him." Ashhurst, J., said: "The word 'occupy' in the proviso, is extremely material to show that the deed must have this operation; for it is a reservation of the thing itself, of the whole estate." Buller, J., said: "Something more was meant than a bare license to inhabit or live in the house, for the word 'occupy' is added to them." The same force was given to the word "occupy" in *Rabbeth* v. *Squire,* 4 De G. & J. 406, where a will gave a joint use and occupation of land. Applying the reasoning found in the above quotations to the language of this exception, it might be said that, if it had stopped with the word

"use," a mere privilege would have been imported, but it does not stop there. It gives, not only the use of the coal bank, but the occupancy of it, and, by giving the occupancy of it, it excludes the grantee and those claiming under him, and this necessarily vests an interest in the grantor.

Thus it clearly appears that, unless a different intention on the part of the parties to the deed can be found, the coal bank itself was excepted. Where is this intention to be found? Not in the deed. In order to hold that less than an estate passes under the exception, it must be found that the words "use and occupancy" were used in some sense different from their technical meaning. The only ground offered for this purpose is the fact that, at the time of the conveyance, the use of coal was limited, and it was not mined extensively, if at all, for commercial purposes, and not mined at all in that section of the country except for blacksmithing purposes, and, therefore, the exception was only intended to give to the grantors the right to go upon the land and take coal for such purpose. Had Hall and Chapman been blacksmiths and using a coal bank for that purpose, that fact might have given some color to this contention. But they were not so using it, nor were they blacksmiths. There was an opening on the land from which coal was taken for blacksmithing purposes, and the inference to be drawn from these circumstances, if any, is that Hall and Chapman were receiving pay for the coal so taken and thus deriving an income from the land which they desired to continue. Moreover, they were lawyers and are supposed to have known the legal meaning and force of the terms used in the exception, a circumstance which strongly argues against any intent different than from that imported by the technical meaning of the terms used. I do not see that the purpose for which the coal was then used has any bearing upon the question. If it be true that only such use was made of this mineral at that time, might not the grantors just as well have reserved to themselves the exclusive right of one coal bank for that purpose as for any other purpose? If such ignorance of the use and value of the mineral obtained at that time, may we not well suppose that the parties were wholly ignorant of the extent of that mine and that the grantors, in order to assure themselves of a sufficient supply, were careful to reserve the whole of it to themselves? The grantee being equal-

ly ignorant of its extent and value, may we not say he was perfectly willing to let it be cut out of the conveyance? If they did, the subsequent demand for, and value of, this great deposit cannot change the original intent. This argument of the limited use of coal and ignorance of its value and quantiy is a sort of two-edged sword, and cuts as deeply on the one side as on the other, and it by no means supports the alleged intent different from that imported by the words used in the deed.

Again, it is said we must ascertain the intent by the conduct of the parties under the deed. What conduct? What use of this coal mine have the grantors or their heirs made? What act of theirs can be pointed to as indicating their construction of this language? Does it appear that, under it, they have confined themselves to the exercise of a mere liberty in taking coal? By no means. It appears that they have done nothing under it. Instead of conduct or acts under it, showing intent or construction, want of action appears. How then, can the rule of conduct be applied? It appears that, since the deed was executed, some thirty-seven years have elapsed, in all of which there has been absolute silence and inactivity on the part of the grantors and their heirs, respecting the reserved coal mine.

A good illustration of the construction of a reservation determined by the acts of the parties under a deed is given in Jones on Real Prop. in Conv., at section 523, where he says: "Thus, where there was an exemption and reservation 'of sixty-eight feet of land from the east end of the described premises,' and the grantor retained possession of a lot of that width along the whole east side of the land, putting the purchaser in possession of the remainder, and the parties built a fence along the line thus fixed, and the grantor built a house and barn on the portion held by him, and after many years conveyed the tract as being sixty-eight feet wide, it was held that the acts of the parties established the interpretation that the exception was of a strip sixty-eight feet wide along the east side of the lot, and not merely of sixty-eight square feet, which would be a strip of the width of only six inches."

In that case there was action, not want of action; things done, not things omitted; affirmative conduct, not entire want of conduct.

The last contention is that, by the use of the words "one of

the coal banks," the parties could have meant nothing more than the surface or walls of the coal or opening. It seems to me, we are not warranted in assuming or inferring that the grantors, in reserving to themselves and their heirs, the exclusive use and occupancy of this coal bank, intended to use it for residence purposes or temporary occupancy when out in pursuit of wild animals, or for any purpose other than the digging down of those walls and making use of the material taken from them. It is pointed out that coal was then used to a very limited extent, even in that wild country, and, as it is impossible to discover any reasonable purpose for which this reservation could have been made, except to make use of the coal, in doing which, the walls would be pulled down and the surface pushed back from time to time, possibly to the extent of exhausting the whole vein, we ought to say that this was the purpose of the exception.

If the court had adopted this view, the result would have been embarrassing to the company now operating in the vein of coal for the recovery of which this suit was instituted. It would have been the result of their own lack of caution and prudence. They must have known this exception was in the deed under which they claimed, and, as prudent men, it was their duty to acquire that outstanding interest before expending their money in the development of the mine.