# CHARLESTON.

CONTINENTAL COAL COMPANY *v.* CONNELLSVILLE BY-PRODUCT COAL COMPANY *et al.*

(No. 5795)

Submitted May 10, 1927. Decided June 7, 1927.

1.  MINES AND MINERALS—*Grantee of Upper Coal Seam May Not Enjoin Removal of Lower Seam by Prior Grantee, Exempted From Liability for Damages From Removal.*

    Where the owner of land containing two or more seams of coal sells the lower seam with full mining rights and privileges, stipulating in the deed that these mining rights may be exercised by the grantee and all the coal removed, "without any liability for damages that may arise from the removal of any or all of said coal . . . without being required to provide or leave support for the overlying strata or surface, and without being liable for any injury to the same, or anything therein or thereon, or to the streams or water courses thereof," and subsequently conveys an upper seam of coal in the land to another vendee who has notice of the provisions in the first deed; the latter vendee cannot, in order to prevent injury to his upper seam from subsidence, enjoin the former from taking out all of the coal from the lower seam in strict accordance with the granted mining rights, properly exercised in accordance with the usual and accepted mining methods. (p. 45.)

    (Mines and Minerals, 40 C. J. § 507.)

2.  SAME—*"Sic Utere Tuo Ut Alienum Non Laedas" Does Not Prevent Removal of Lower Seam by Prior Buyer, Exempted From Liability for Damages.*

    And in such case, the damages resulting to the overlying strata and surface and anything therein or thereon, having

been paid for in the purchase, the maxim of "sic utere tuo ut alienum non laedas" cannot be invoked to prevent the proper, economic, and approved method of removal of all the coal in the lower seam.  (p. 60.)

> (Mines and Minerals, 40 C. J. § 569; Sic Utere Tuo, 36 Cyc. p. 436.)

> (NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

WOODS, JUDGE, dissents.


Appeal from Circuit Court, Monongalia County.

Suit by the Continental Coal Company against the Connellsville By-Product Coal Company and another for an injunction.  From an injunction order, defendants appeal.

*Reversed; bill dismissed.*


*William S. Haymond* and *Frank C. Haymond*, and *Frank Cox*, for appellants.

*Charles A. Goodwin* and *E. M. Showalter*, for appellee.


LIVELY, JUDGE:

The appellants, the Connellsville By-Product Company (hereinafter referred to as the By-Product Co.) and the Cochran Coal & Coke Company (referred to herein as the Coal & Coke Company), appeal from an injunction order prohibiting them from mining the seam of Pittsburgh coal underlying a part of 153 acres in Monongalia County, in such a way as to unnecessarily injure the appellee, the Continental Coal Company, and its employees, in the latter Company's operation of the Sewickley vein of coal overlying the 153-acre tract just mentioned.

On the west side of the Monongahela River, in Monongalia County, there is a coal field containing about 180 square miles of coal lands.  The Scotts Run district is a part of this field. The Sewickley and Pittsburgh seams extend over this area with almost equal persistency, the latter seam lying about 90 feet below the former.  In this region the Pittsburgh seam has an average thickness of about 8 feet and the Sewickley an average thickness of about 6 feet.  The Pittsburgh seam has about 13,000 tons of recoverable coal per acre; the Se-

wickley 10,000 tons per acre. Both coals now command good prices, and at present there are a large number of companies operating these veins of coal in this field. In 1902, before the Sewickley seam had attained a commercial value, the defendant Coal and Coke Company became the owner of about 12,000 acres of the Pittsburgh coal in this district, including the Pittsburgh coal underlying a part of the 153-acre Sewickley tract of the plaintiff. The lack of railroad facilities prevented the development of coal property in this section until 1916 or 1917, when a railroad was built on Scotts Run. In the meantime, in 1918, the Diamond Coal Company, the predecessor in title of the plaintiff, acquired 125 acres of the Sewickley vein of coal, and later, in August, 1921, an additional tract of the same coal was obtained, which two tracts taken together make up the 153 acres mentioned above. The 125-acre tract had been opened by the Liberty Fuel Company in 1917 as the Liberty Mine, but no intensive development of the operation was attempted until 1919, after the Diamond Coal Company obtained the property. From that time until 1921, when the peak of production (1200 tons daily) was reached, the capacity of the mine was gradually increased. In January, 1925, the plaintiff Continental Coal Company and the Diamond Coal Company were merged, and the property of the latter was conveyed to the former, the present owner.

By writing of Sept. 30, 1920, the defendant Coal & Coke Company leased to the defendant By-Product Company 2100 acres of Pittsburgh coal on Scotts Run, about 110 acres of which was under a part of the 153-acre Sewickley tract of the plaintiff Coal Company.

In the title papers by which the Cochran Coal & Coke Company was granted that part of its Pittsburgh coal underlying a part of the 153-acre Sewickley tract of the plaintiff, there is contained the following provision to the effect that besides the coal thus granted, the Coal & Coke Company should have, " . . . the right to mine and remove all of said coal, and with the free and uninterrupted right-of-way into, upon, over and under the said lands, at such points and in such manner for such ways, tracks and roads as may be

necessary and proper for the purpose of ventilating, draining, digging, mining, operating and carrying away said coal, or other coal or coke, without any liability for damages that may arise from the removal of any or all of said coal, or the manufacture of coke, without being required to provide or leave support for the overlying strata or surface, and without being liable for any injury to the same, or anything therein or thereon, or to the streams or water courses thereof; . . ."

In 1920, the By-Product Company laid out its mine (Connellsville No. 1) and projections under the 2100-acre tract, and began developing it. The first coal was shipped April 8, 1921. The mine openings of the plaintiff's Liberty Mine and Connellsville No. 1 were about 3,000 feet apart. In about two years and a half after the opening of its mine, the mining operations of the defendant By-Product Company were extended until they reached the 153-acre tract of the plaintiff. And in conformance with its room and pillar system, in 1923 the defendant company began to draw pillars from under a part of the Liberty Mine. This continued until 1924, when plaintiff says it learned that defendant By-Product Company was drawing pillars from under its (plaintiff's) mine in such a manner as to endanger its main haulway and aircourse. In an endeavor to adjust this situation negotiations were entered into between the representatives of the respective companies, but after several months had passed, their efforts to reach an agreement failed, the plaintiff refusing to pay the $19,000.00 demanded by the defendant By-Product Company for the coal (6 and a fraction acres) which, for a period of ten years, was to be left in place, in the form of pillars and barrier pillars, to protect the main haulway and aircourse of the plaintiff. The defendant By-Product Company claimed that this sum represented the royalty it was required to pay the Coal & Coke Company for the coal so left, under its lease with the latter Company, and that as most of the coal left in these pillars would be a total loss to it, as far as the By-Product Company was concerned, it would not be gaining anything by this agreement, but would in fact be suffering a loss because of the coal lost and the change in

mining operations which would be necessary to meet the changed conditions. The plaintiff Company contended that as the title to the coal would remain in the defendants, it would be beyond reason to expect the plaintiff to pay such a sum for the desired protection.

By reason of the defendant By-Product Company drawing its pillars from beneath the plaintiff's Sewickley mine, a subsidence was caused in 1924, in the north-east part of the Liberty Mine. The damage sustained by the plaintiff in this instance was not great; but on August 1, 1925, a subsidence occurred under the main heading and air-course of the Liberty Mine, covering a space about 300 feet long. The plaintiff had to abandon its Third Left Section until another haulway (a secondary one) was cut; and the coal affected by the subsidence is a total loss (amounting to about $8,100.00). According to plaintiff's evidence, it is doubtful if any coal south of this cave-in can be removed.

On August 22, 1925, the plaintiff secured a preliminary injunction restraining the defendant By-Product Company from mining and removing the Pittsburgh coal of the defendant under the 153 acres of Sewickley coal, in such a manner as to unnecessarily injure the plaintiff and destroy its mine and endanger the lives of its employees. Bond of $12,-500.00 was required of the plaintiff. On December 9th, the defendants appeared and moved to dissolve the temporary injunction, and filed their joint and several demurrer and answer thereto. On January 25, 1926, the plaintiffs filed an amended and supplemental bill. January 30, 1926, defendants moved the court to dissolve the injunction as to a portion of the mine, which motion was overruled, but at this time a motion to increase the plaintiff's bond by $7,500.00 was sustained. On April 29, 1926, the joint and several demurrer and answer of defendants to the amended and supplemental bill were filed.

On July 24, 1926, the cause came on to be finally heard upon the pleadings and exhibits filed therein and the testimony taken in the form of affidavits by agreement of parties; and at this time the court overruled defendants' motion to dissolve the temporary injunction, and made the same per-

manent. In this final order the court decreed that the defendant Companies be perpetually enjoined from mining and removing their Pittsburgh vein of coal underlying the 153 acres of the plaintiff's Sewickley coal, in such a way as to unnecessarily injure the plaintiff and destroy its mine and endanger the lives of its employees, and the defendants were "required to so mine and remove said Pittsburgh coal and to use such methods of mining said coal as will not necessarily endanger the workings of the plaintiff's said mine and the safety of the lives of the plaintiff's employees, and to so conduct the operations of their mine in the mining of coal therefrom, as will protect the plaintiff's coal mine from unnecessary injury and damage, and permit the plaintiff to operate its mine and produce its coal therefrom."

The basis of the plaintiff's right to obtain the injunction awarded in this case, as contained in its pleadings, is that notwithstanding the superior mining rights appurtenant to the defendants' seam of Pittsburgh coal underlying the 153-acre Sewickley tract of the plaintiff, a court of equity has jurisdiction and power under the facts and circumstances of this case to enjoin the defendants from using and exercising their mining rights in their Pittsburgh seam of coal in such a way and by such methods as will result in unnecessary injury and destruction of plaintiff's Liberty Mine and endanger the lives of its employees; and to require defendants to use such methods of mining as will not result in intentional or unnecessary injury or destruction of the plaintiff's mine. The doctrine of *sic utere tuo ut alienum non laedas* is invoked.

On the other hand, the defendant By-Product Company and its co-defendant, the Coal & Coke Company, contend that by reason of their superior mining rights in the Pittsburgh seam of coal, the By-Product Company was entitled to develop that part of its coal under the plaintiff's 153 acres, in such a manner as best comported with the plan of development of its 2100-acre tract, and that so long as its coal was mined according to approved methods, no liability could attach by reason of its withdrawal of pillars from under plaintiff's operation, in carrying out this plan.

In support of its bill and amended and supplemental bill
the plaintiff introduced evidence to the effect that defendant
had mined its coal in such a way that it must necessarily
have resulted in injury to the plaintiff's mine and endangered
the lives of its employees, when there were at least two meth-
ods by which these results could have been obviated.   Ac-
cording to the plaintiff's witnesses, these two methods were:
(1) That by mining the Pittsburgh seam on 80-foot to 100-
foot room centers (instead of the 60-foot centers used by de-
fendant By-Product Co.), the pillars in defendant's mine
would have been left standing for a sufficient length of time
to enable the plaintiff to operate its Sewickley vein ahead
and without loss to the Pittsburgh operation by reason of
leaving the pillars standing; and (2) That the defendant
By-Product Company could have moved its No. 1 South
Section Heading about 400 feet West so as to be under
the main haulway and air-course of the Liberty Mine, and
that it could have moved its No. 1 North Section Heading
about 1200 feet West so that it would be under the main
heading and air-course of the Liberty Mine, and the barrier
pillars left on each side of these headings would have been
left under the main haulway and air-courses of the plain-
tiff's mine, thereby protecting the same from any subsidence
under its main haulway and air-course.   Plaintiff's witnesses
further said that the adoption of this plan would have en-
abled the plaintiff to mine and remove all of its coal; and
the defendant By-Product Company could have operated its
mine as economically and efficiently as it had been able to
do with the plan it did adopt in projecting its operation.

The plaintiff offered a number of expert witnesses who tes-
tified that defendant could have adopted either of these plans.
Two or perhaps more of these witnesses further said that the
development of defendant's mine on 60-foot room centers was
not good mining practice because of the heavy over-burden,
and that in the last five years it has been demonstrated that
80 to 100-foot centers were proper to be used in mining op-
erations in this field.   Plaintiff's witnesses also testified that
in other mines the Sewickley and Pittsburgh veins of coal
were being mined concurrently; and that in at least one case

the two veins were being operated concurrently by different companies. Evidence was also offered to the effect that the remaining 28 acres of recoverable Sewickley coal could be mined in about two years' time.

The defendants produced a much larger number of expert witnesses who testified that neither of the two plans suggested by plaintiff's witnesses were feasible; that the defendant By-Product Company's mine had been laid out in accordance with a plan for the mining of the 2100-acre tract; that the Connellsville No. 1 Mine was a model mine; that the use of 60-foot room centers under the 153-acre tract was good mining practice as long as the pillars were withdrawn upon the completion of the rooms; that it was not necessary to have 80 to 100-foot room centers in this portion of defendant's mine, because the overburden did not demand the use of such centers; that because of the manner in which plaintiff's mining operations in its Sewickley vein had been carried out (the irregularity in width of its rooms and lack of a system of driving its rooms on uniform centers, etc.), and considering the fact that the plaintiff's mine had been in operation four years before Connellsville No. 1 was opened, and that the openings of the two mines were 3,000 feet apart, it would have been impracticable for the defendant to have conformed to such a system and to have mined its coal concurrently with the plaintiff; that it would have been necessary for defendant By-Product Company to have left at least sixty per cent of its coal in place for a considerable time if it was required to leave support for the Sewickley vein until it was mined; that this would impose a hardship upon the defendant both from the standpoint of production and from an economical viewpoint, it being a well known fact that if pillar coal is allowed to stand for any great length of time the amount of recovery is greatly lessened by reason of the overburden crushing the top of the pillars and reducing the top part of the pillars to slack coal, with the added expense of the renewal of timber, and the cost of maintaining the ventilation in these portions of the mine and expense incident to the re-laying of track. Defendants' witnesses further testified that to have moved defendant By-Product Company's

No. 1 South Section Heading 400 feet West so as to bring it beneath plaintiff's main haulway and air-course would have resulted in leaving for a period of from 40 to 50 years (life of defendant's mine) a solid block of coal 600 feet by 2,000 feet between the outside boundary line of the defendant By-Product Company's mine and the section heading as relocated; and to have moved defendant's No. 1 North Section Heading 1200 feet West so as to bring it beneath plaintiff's main haulway and air-course would likewise have tied up another block of coal 1200 feet wide between the newly located section heading and defendant's boundary line for a similar period of time, resulting in great loss to the defendant By-Product Company in the mining of its coal. It was further testified that the adoption of such a plan would only protect the main haulway and air-course of the plaintiff's mine and would afford no protection to other parts of its mine. In answer to the plaintiff's suggestion that the shifting of the section headings might eliminate the water from defendant's mine, defendant's witnesses said that although this might be true, yet the advantage thus gained would be more than offset by the disadvantages which would result from the adoption of such a plan, with its consequent disarrangement of defendant's original scheme to mine its 2,100 acres; that such a change must necessarily result in lowered production of defendant's coal in that portion of its mine. Defendant's witnesses further testified that the 28 acres of coal left in plaintiff's mine was pillar and stump coal; that probably not more than 60 per cent of this remaining coal was recoverable; and that it would take several years for plaintiff to complete its mining operations, judging from the progress heretofore made by it.

It appears from the evidence that when the 60-foot room centers are used about thirty per cent of the coal is mined on the advance and about seventy per cent is left in the pillars to be mined on the retreat; whereas if the coal is mined on 80 to 100-foot centers, about fifteen per cent is taken out in the advance and approximately eighty-five per cent is left in the pillars. The size of the room centers determines the size of the pillars. It also appears that defendant is planning

to use 80 to 100-foot room centers after its mining operations are extended beyond plaintiff's mine. The defendant explains this by saying that the superstructure becomes heavier as it proceeds and the larger pillars become necessary to support the mine. Plaintiff's witnesses say that the real cause for the change in plans was because the defendant found the pillars left under the 60-foot room center plan were inadequate to support the over-burden under a part of the 153-acre tract. The defendant By-Product Company has mined about 400 acres of its 2,100-acre tract. It might be well to note also that the evidence shows that there are a number of Sewickley operations overlying the remaining portion of the 2,100 acres of defendant's Pittsburgh seam of coal.

Plaintiff's rebuttal witnesses were of the opinion that the relocation of defendant's section headings as suggested by plaintiff's witnesses would not greatly inconvenience the defendant nor greatly handicap it in the production of its coal and development of its mine, because part of the coal thus isolated could be mined on the advance and the remainder on the retreat without any great loss being sustained by defendant. It was also pointed out by these witnesses that the protecting of plaintiff's main haulway and air-course in the manner described above would be of great advantage to plaintiff's mine in transferring coal which would be mined out of a part of its 153-acre tract not lying over the defendant's Pittsburgh seam of coal. At least two of these rebuttal witnesses said that while the shifting of these section headings under the main haulway and air-course of the defendant would cause some inconvenience and delay to the defendant and perhaps delay its plan of development, yet they felt that as the protection thus afforded the plaintiff would enable it to complete its mining operations, the advantage thus gained by the plaintiff would justify such action on defendant's part. These witnesses further said that if the defendant had owned both seams of coal they did not believe defendant By-Product Company would have objected to so changing its section headings.

The trial chancellor's opinion, and the argument of plaintiff's counsel, are both based upon the fact that plaintiff

Company began its mining operation of the Sewickley seam first in point of time, wherefore the contractual right of defendant By-Product Company to mine the Pittsburgh seam without liability for any injury to the ''overlying strata or surface or anything thereon or therein'', was abridged to the extent that it must mine its coal in conformity with the plan adopted by plaintiff, in order to protect plaintiff's mine, and give plaintiff time to take out the Sewickley seam without damage. This basis of reasoning is unsound, for it rests upon the assumption that defendants by delay in beginning their mining have lost full use of the property right which they purchased, and makes the full enjoyment of their mining rights depend upon a race between them and some purchaser of the overlying seam. The purchaser of the Sewickley seam or the other seams in the land (and there are two other seams—the Redstone 30 feet above the Pittsburgh, and the Waynesburgh approximately 350 feet above the Pittsburgh seam), could have no greater mining right than the owner who had contracted for a valuable consideration that the Pittsburgh seam under his land could be mined and removed without leaving support for the overlying strata and surface. If the original owner of the land, immediately after deeding the Pittsburgh seam with the broad mining rights enumerated, began mining the Sewickley seam, it would scarcely be considered that because he began first, he had thereby changed his first deed contract so as to be more advantageous to himself, and less advantageous to his vendee. Upon the same reasoning it would be held that if he had built an expensive dwelling or business house on the surface before the mining of the Pittsburgh seam began, the courts, upon his complaint, would compel his vendee to plan his mining operation, or if he had begun, change the plan, so as not to cause subsidence of the surface on which his improvements rested, or desist until he could close his business and remove from danger; or by first planting valuable crops he could enjoin threatened subsidence of the surface until his crops ripened and were removed. His vendee of the Sewickley seam stands in no more strategic position than he does, for it purchased with notice. Verily the race is not to the swift. The legal principles in-

volved are not dependent upon the swiftness of either party.

There are numerous assignments of error to the decree, but all except one are merged in the controlling question as to whether the owner of the Pittsburgh seam first conveyed with full comprehensive mining rights, including waiver of damages arising from the removal of that seam, and express release of the duty to leave support for the overlying strata or surface or anything therein or thereon, granted by the then owner of the overlying Sewickley seam, can be enjoined by a subsequent purchaser of the Sewickley seam, from removing any or all of the Pittsburgh coal, when such removal will cause subsidence of the overlying strata, causing damage to that coal and the mining operation by which it is being taken out. The other point of error is that the injunction is indefinite and in part mandatory and requires defendants to mine the Pittsburg seam in such a manner as not to unnecessarily injure plaintiff, destroying its mine, or endangering the lives of its employees, thus leaving defendants to interpret what is meant (no specific act or plan being required or prohibited), and requiring defendants either to stop mining or run the risk of contempt, not knowing what act is prohibited or commanded.

That a landowner may sell his subjacent support can scarcely be questioned. It is a valuable property right, as much so as the mineral underneath or the timber growing on the surface, and the courts have been careful to preserve it unimpaired wherever it is possible to do so. It is not to be taken from him by implication. This court went a long way in *Griffin* v. *Fairmont Coal Co.*, 59 W. Va. 480, where it held that the owner had parted with his subjacent support because he had sold *all* of his underlying coal with free and unobstructed right to remove *all* of the coal. That case and our recent one of *Goodykoontz* v. *Mining Co.*, 94 W. Va. 654, have little application here on this point, except to accentuate the proposition that a landowner may sell his subjacent support. The courts are in accord in holding that where the landowner has deeded his mineral, and has not used express words showing clearly or by necessary implication that he has waived or qualified his right to subjacent support, the presumption is

that he has retained the surface with its natural support. But here we are not dealing with the question of reservation of subjacent support, for by clear and unequivocal language the owner has sold that property right for a valuable consideration. Being the owner of the land and all therein contained from the surface to the center of the earth, he may contract with reference to it in any manner so long as he does not violate some law or public policy. *Miles* v. *Pa. Coal Co.*, 217 Pa. St. 449, 10 Am. & Eng. Anno. Cases 871. There is no law or public policy in this State which prevents a landowner from selling his right of subjacent support. *Godfrey* v. *Weyanoke Coal & Coke Co.*, 82 W. Va. 665, 97 S. E. 186. Reference to the language used leaves no doubt that the vendor sold not only his property right in the Pittsburgh coal but also sold his property right to subjacent support for the strata lying above that seam and the surface, exonerating the vendee from liability for injury to the overlying strata or surface, "or anything therein or thereon".

Compensation for an injury to property is a proper matter of contract, and there is no reason why such injury may not be compensated by contract as well as by a verdict of a jury or decree of a court. All damages here were settled by contract in advance. That kind of contract is quite common. Where parties contract lawfully and their contract is free from ambiguity or doubt, their agreement furnishes the law which governs them. Where the meaning of a contract is clear, a court will not change its terms, in order to relieve a party thereto because the contract is harsh and unreasonable. "Nor will the dictates of equity be followed if by doing so the terms of a contract are ignored, for the folly or wisdom of a contract is not for the court to pass upon." 13 C. J. p. 542, Sec. 513. "Equity follows the law." Having been paid in advance for all damages resulting to the overlying strata and surface, including anything therein or thereon, it is not perceived on what ground the landowner could base a suit for damages by reason of subsidence of the strata or surface occasioned by a removal of the Pittsburgh seam, unless perhaps he could show that the subsidence was caused by some wanton or willful act unnecessary or improper in the conduct

of his mining operation. If the owner could not recover damages resulting from a proper removal of the coal, could he enjoin that removal in order to prevent those damages? What right has he to protect? And if the landowner could neither sue for damages nor enjoin, is his vendee of the Sewickley seam in a position to assert any higher legal right? Surely not because he took possession and began operation first. His possession is no higher or stronger than that of his vendor who has always been in possession.

Plaintiff admits that subjacent support has been contracted away from under its mine, and that defendants have superior and extensive mining rights, but asserts that defendants should be enjoined from exercising these rights because it had laid out its mine and begun operating first, at a great outlay of money, basing its claim for equitable relief on the following grounds: (1) Because defendant did not lay out its mine to conform to plaintiff's mine plans, in that it did not move its No. 1 South Section Heading a distance of 400 feet West, and its No. 1 North Section Heading 1,200 feet West, so as to place these two section headings directly under plaintiff's main haulway and air-course, thus protecting them from subsidence; and (2) Because defendant By-Product Company operated its mine on 60-foot room centers, when 80 to 100-foot room centers would have delayed the pulling of the pillars and allowed plaintiff more time to take out all of its coal before subsidence damaged it.

Counsel on each side state their inability to find any American decision where the rights of the owners of different seams of coal were involved, arising under a contract by which the owner of the lower seam was empowered to mine that seam without liability for damages to strata overlying, and search by us has revealed none. Many cases deal with the relative rights of the coal seam owner and the surface owner under such contracts. These cases are in accord with *Godfrey* v. *Weyanoke Coal & Coke Co.*, 82 W. Va. 665, above cited. They hold that the surface owner cannot recover damages for subsidence of the surface under such contracts. And in *Stilley* v. *Pittsburgh-Buffalo Co.*, 234 Pa. St. 492 (1912), the court refused an injunction sought by the surface owner to restrain

the removal of all the underlying coal, which removal had caused, and if continued would further cause, damage to the surface and the dwellings, barns and other improvements thereon. The coal had been granted with mining rights and without liability for damages arising from the exercise of such rights. The covenant relieving the mine owner from damages was not as specific and clear in that case as in the case at bar. The English decisions as well as the decisions in the States emphasize the common law right to subjacent support, and the disposition of the courts to interpret *if possible* the language of the instrument separating the estates consistently with the intention to preserve that support. But where the language is clear and the intention manifestly is to part with subjacent support, the courts enforce the agreement on the principles governing ordinary contracts, however harsh and unreasonable they may be. The case of *Butterknowle Colliery Co.* v. *Bishop Auckland Industrial Co-operative Co.*, (1906) A. C. 305, appears to contain a restatement of the principles applied by the English judiciary in the determination of the question of waiver of subjacent support. And the later case of *Butterley Company, Limited* v. *New Hucknall Colliery Company Limited*, (1910) A. C. 381, 99 L. T. R. 818 (1909) 1 Law Repts., Chancery Div., p. 37, cited by appellants, involved a controversy concerning subjacent support for an overlying seam of coal. The landowner had granted the overlying seam of coal with full power of working it, reserving, however, the right of the owner to lease the underlying seam with like power subject to a covenant by the owner to indemnify the first lessee against damage caused by working the underlying seam. The first lessee was to have the first offer of the underlying seam, which was made to him and was refused, and then the lease of the underlying seam was made. It appeared from the leases and evidence that the underlying seam would be worked concurrently with the overlying seam and by the "long wall" system, which would of necessity produce subsidence in the overlying seam. An injunction was sought by the lessee of the overlying seam to prevent the lessee of the lower seam from further working that seam so as to cause subsidence or damage to the overlying

seam. The case was finally taken to the House of Lords which affirmed the court of appeals in holding that the respondents were entitled to work the lower seam by the "long wall" method, *leave to cause subsidence being clearly implied.* The later case of *Jones* v. *Consolidated Anthracite Collieries, Limited,* 1 Law Reports (1916), King's Bench Division, p. 123, approved the principle applied in the *Butterly* case. Counsel for appellee in the case at bar criticize the holding in the *Butterly* case, because the court and the House of Lords found that the lower seam lessee was by *implication* empowered to mine without regard to subsidence of the upper seam, and say that such a holding is not in consonance with our decisions. The question of "implication" does not arise in this case. The contract is clear. The English court having found that the contract gave (by implication) the lessee of the underlying seam the right to mine, even if it did cause subsidence in the upper seam, accorded him that right, and refused to restrain him from exercising it upon the complaint of the owner of the upper seam.

Counsel for appellants have cited the well considered case of *Pa. Coal Co.* v. *Mahon,* 260 U. S. 393, 43 S. C. Rep. 158, which created much public interest in the questions involved while it was pending. In that case the defendant coal company was mining anthracite coal in the vicinity of Scranton, in the State of Pennsylvania. The deed in that case granted the surface with the right reserved to take out all the coal, the grantee taking the risk and waiving all claim for damages arising out of the mining of the coal. The surface owner sought and obtained an injunction to restrain the coal company from taking out *all* of the coal, thus causing subsidence and damage to his permanent improvements on the surface. The attorney general of the State and representatives of other extensive interests appeared and were permitted to submit arguments. If the coal company could cause subsidence of the surface, not only private property would be in danger but also roads, streets, public buildings and the like would be in like danger. The important and populous City of Scranton was in the danger zone. Plaintiffs conceded that the Coal Company may have had the right under its contract to cause

subsidence, but asserted that this right was taken away by an act of the legisláture, which forbade the mining of anthracite coal in such a way as to cause subsidence, among other things, of any structure used as a human habitation. The statute destroyed the previously existing right of the Coal Company under its contract, and it was sought to be upheld as a valid exercise of the police power. The Supreme Court of the United States denied this contention, and held the act to be in violation of the Federal Constitution, as impairing the obligation of a contract, and as taking private property for public purposes without compensation. The court said that if it was desired that pillars of coal should be left in order to prevent subsidence, those benefitted should pay therefor, either by condemnation or purchase. Coal would be of little value without the right to mine it. Mr. Justice Holmes very aptly said in the opinion: "In general it is not plain that a man's misfortunes or necessities will justify his shifting the damages to his neighbor's shoulders." The court recognized the principle that the use of property may be regulated, but when regulation goes to the extent of a taking, it will not be upheld.

Plaintiff admits the dominant right of defendants to mine and remove all of the Pittsburgh seam. It does not claim a legal right to subjacent support; it says it does not seek to abridge defendants' property right, nor the impairment of their contract; nor does it seek equitable condemnation of defendants' coal for its use as a subjacent support. The equity it asserts to maintain its case is that it began operation first and that defendant ought to have recognized this fact and in tender consideration of its rights, should have laid out its mine so as to conform to plaintiff's mine, and take out the coal in such a manner as to leave subjacent support until such a time as plaintiff can remove all of its Sewickley holdings from danger. Plaintiff invokes the maxim of "sic utere tuo ut alienum non laedas" as the basis of its equity. Plaintiff's predecessors in title had full knowledge of defendants' superior and extensive mining rights, when the operation of the Liberty Mine was begun in 1917, and plaintiff had like knowledge when it acquired the operation. There is no evi-

dence that either it or its predecessors in title made any effort to conform its mine so as not to trespass upon or complicate the contemplated mining operation of defendants. Evidently the owners of the Liberty Mine took the risk of getting out their coal first, or thought that defendants would voluntarily abridge their superior mining rights and refrain from causing subsidence until the coal had been removed from the Liberty Mine. Even after the defendant By-Product Company had laid out its mining plans on its 2,100 acres and begun operating Connellsville Mine No. 1, and had begun shipping coal therefrom on the 8th day of April, 1921, plaintiff's predecessor in title acquired an additional tract of coal (about 28 acres), which, taken together with the 125-acre tract previously acquired, made up its 153 acres of Sewickley coal. About that amount (28 acres) of acreage remains unmined according to plaintiff; defendants say that of this 28 acres not more than 60 per cent is recoverable coal. Had plaintiff's predecessors in title conferred with defendants and laid out their operation in conformity to that conference, plaintiff would have been in a better position to call for equitable relief. Granting that the maxim of "sic utere" applies, there are mutual obligations under that maxim. That maxim required plaintiff to use its property so as not to injure or hamper the superior property right of another.

While there is a charge in the amended bill that defendants were negligent in their mining operations by reason of which the subsidence occurred, and their continued negligence will cause further subsidence and damage, without pointing out any specific act of negligence except that hereinbefore indicated, the evidence fails to show any negligent operation of the mine. The evidence is rather conclusive that defendant By-Product Company's mine is a model both in plan and operation. Plaintiff had ample notice that defendant Company was pulling its pillars, and of the time they would be pulled under the main haulway. The parties had conferred for the purpose of agreeing that the pillars should remain, for a consideration. Failing to agree, the pillars were removed, a subsidence occurred, and this suit followed. Plaintiff in its original bill asked that defendants be compelled to leave

subjacent support, offering to be put upon terms of paying therefor; but afterwards, conceiving and alleging that defendant had willfully laid out its mine and conducted its operation with the intent to destroy plaintiff's operation, it was permitted to withdraw its offer.

But we come to the specific reasons invoked for equitable relief, namely, the failure of defendants to move its No. 1 North and No. 1 South Section Headings immediately under the main haulway and air-course of plaintiff; and the plan of 60-foot room centers. Defendant By-Product Company's uncontradicted evidence is that its mine plan was made with reference to its 2,100 acres of coal, and the preponderance of the evidence is that for that reason it was impracticable for it to have moved its headings as suggested, and to have done so would have tied up for the life of the mine (40 or 50 years) a block of coal 600 feet by 2,000 feet and a block of coal 1,200 feet wide, between the newly located section headings and defendant's boundary line; all of which would have resulted in great loss; and besides, if defendant By-Product Company was compelled to lay out its section headings under plaintiff's mine as suggested, it would also for the same reason be compelled to do the same throughout its operations on the remainder of the 2,100-acre tract with reference to other mines, which would render mining of its seam impracticable, complicate its air-courses, destroy the continuity of its system, and render mining unprofitable. And on the other point, the evidence preponderates to the effect that the use of the 60-foot room centers was the proper method of mining under the 153-acre tract, and that the overburden there did not require otherwise. To require defendant By-Product Company to adopt methods of mining which would be impracticable or cause loss, in order to protect plaintiff, obviously would make defendants' estate servient instead of dominant. Would not such a holding change the contract? If a court can impair the contract or change its obligations in that respect, by the same token it could require defendant to leave subjacent support for the surface as well as for the overlying strata and everything thereon or therein. The decided cases are to the contrary. Can we disregard these decisions? Counsel for

plaintiff say we should take a step forward under the ever-expanding principles of equity to meet changing conditions, and modify the ancient and established rules respecting sub-jacent support. We see no occasion for changing the well-settled rule of property in this case. Defendants argue that if they are compelled to conform their mine to that of the plaintiff in the instant case, and are required to leave pillars for subjacent support until the overlying seam is mined out, the same requirement will be imposed upon them as they mine the remainder of their large acreage, and would result in taking or impairment of their millions of investment. That does not necessarily follow. Each case must rest upon its own particular facts. A case may arise of clear negligence or un-skillful mining causing subsidence. And by finding that the present case does not warrant injunctive interference we do not mean to say that a case cannot arise which would war-rant it.

In passing, it may be well to observe that while govern-mental or public policy will not impair the obligation of a contract, nor take property under the police power without due process and adequate compensation, reasonable regula-tions concerning the manner of using the property for the public welfare may be and often are enforced. Conservation of gas by requiring wells to be plugged when not in use or abandoned, regulations with respect to drilling wells through coal seams for the protection of the coal, penalties for exca-vating coal within five feet of the property line, are all fami-liar illustrations. We are not directed to any law or public policy which prohibits a land owner from selling subjacent support, although thereby his overlying minerals and sur-face may be damaged or destroyed. *Godfrey* v. *Weyanoke Coal & Coke Co.,* 82 W. Va. 665. The legislature has not seen fit to act in that regard.

We do not find that defendants have used a negligent or careless method of exercising their comprehensive mining rights and privileges for which they paid value, nor that they were negligent or careless in mining the coal under that method. Economic mining requires all pillars to be drawn eventually, and because the pillars were drawn as the opera-

tion progressed is not negligence. Defendants had this right, and with knowledge and notice plaintiff and its predecessors placed themselves in a position to be injured by the exercise of it, and plaintiff now says that defendants should so use their property as not to injure plaintiff's property, and to that end should have changed their section headings, or should now leave supports to 'avoid subsidence, until plaintiff can get out its coal. Practically the same argument was advanced in *Griffin* v. *Coal Co., supra*, invoking the maxim of *"sic utere"*, and was there discussed and denied. It would serve, no useful purpose to repeat or amplify the reasons there given denying the application of the maxim in cases of this character.

The decree perpetuating the injunction will be reversed, and the bill dismissed.

*Reversed; bill dismissed.*