ALEXANDER JAY BRUEN, JR., *et al. v.* H. H. THAXTON *et al.*

(CC 670)

Submitted September 22, 1943. Decided November 30, 1943.

*Blue, Dayton & Campbell* and *Root, Clark, Buckner & Ballantine,* for plaintiffs.

*W. T. Homberg, Osman Swartz, Harold A. Ritz* and *B. J. Pettigrew,* for defendants.

Fox, Judge:

On March 2, 1854, Alexander M. Bruen made a deed by which he conveyed to Robert Thaxton a tract of 125¼ acres of land located in Kanawha County, referred to in the pleadings as 125 acres, subject to an exception and reservation reading as follows:

> "Excepting and reserving all the Coal and Iron minerals found in or upon said land to the said Alexander M. Bruen his heirs and assigns, with rights of way of ingress and regress necessary to the full enjoyment and use of this reservation and granting to the said Thaxton license to use such quantities of said minerals as may be required for his household and domestic purposes."

Said deed will be hereinafter referred to as the "Bruen-Thaxton deed", and the exception and reservation as "res-

ervation". The plaintiffs are the successors in title to whatever was reserved and excepted by the language of the deed quoted above.

Robert Thaxton continued as the owner of the said tract of land until January 3, 1880, on which date he conveyed the same to Monroe S. Thaxton, by a deed, the habendum clause of which contains the following:

> "To have and to hold the said tracts of land unto the said Monrow S. Thaxton his heirs and assigns forever, the minerals are reserved to A. M. Bruen and further that said parties of the first part will warrant generally the property hereby conveyed."

A number of conveyances of the said land followed, in most of which some reference is made to the deed of January 3, 1880. H. H. Thaxton finally became the owner, and on June 14, 1919, conveyed the same to G. W. Facemyre and Cora Facemyre, reserving, however, a one-half interest in the oil and gas therein, with the usual mining rights and privileges. On January 16, 1935, G. W. Facemyre and Cora Facemyre leased said land to William O. Ziebold for oil and gas purposes; and on May 13, 1936, H. H. Thaxton and wife leased to the said Ziebold, for the same purposes, 62½ acres, which is assumed to represent the interest claimed by them in the oil and gas in the 125 acre tract. It appears from the record, that these two leases were assigned by Ziebold to the United Carbon Company; and by it to the United Fuel Gas Company, which latter company now claims to be entitled to develop the oil and gas in said land under the leases aforesaid. On November 5, 1939, G. W. Facemyre and Cora Facemyre conveyed the 125 acre tract to Roy L. Facemyre and Minnie M. Facemyre, reserving to the grantors, for and during their natural lives, a one-half undivided interest in the oil and gas therein, with the remainder to the grantees in said deed.

The plaintiffs, claiming to be the owners of the oil and gas in the tract of 125 acres of land, under the exception

and reservation of "all the coal and iron minerals" contained in the Bruen-Thaxton deed, instituted this suit, in the Circuit Court of Kanawha County, for the purpose of having removed, as a cloud upon their alleged title thereto, certain deeds and other writings purporting to deal with and vest title to and rights in said oil and gas, as the property of persons and corporations other than the plaintiffs. The bill of the plaintiffs was filed at April Rules, 1941, and the following persons and corporations were made parties defendant thereto, namely: H. H. Thaxton and Florence C. Thaxton, his wife, G. W. Facemyre and Cora A. Facemyre, his wife, William O. Ziebold, United Carbon Company, a corporation, and United Fuel Gas Company, a corporation. The prayer of their bill reads as follows:

> "Being without remedy, save in a court of equity, plaintiffs pray that the title of the plaintiffs to the oil and gas underlying said tract of 125 acres may be established and quieted; that the leases exhibited and identified as 'the Facemyre-Ziebold Lease' and 'the Thaxton-Ziebold Lease', and the deeds exhibited and identified as 'the Thaxton deed of June 14, 1919', and 'the Facemyre deed of November 15, 1939', to the extent that said deeds purport to reserve any interest in the oil and gas underlying said tract of 125 acres, may be cancelled and set aside as clouds upon the plaintiffs' title to the oil and gas underlying said tract of 125 acres; that the defendants William O. Ziebold, United Carbon Company, and United Fuel Gas Company may be required to make discovery as to the matters hereinbefore alleged with respect to which the plaintiffs have prayed for a discovery; and may plaintiffs have such other, further, general and special relief as the nature of their cause may require, and, in duty bound they will ever pray, etc."

On May 15, 1941, in open court, defendants United Fuel Gas Company, William O. Ziebold and United Carbon Company tendered and asked leave to file their joint and separate demurrer and answer to the plaintiffs' bill, and

the same were ordered to be and were filed. Subsequently, the said defendants, over the objection of the plaintiffs, were permitted to withdraw their demurrer; whereupon the plaintiffs tendered their demurrer to the said answer, and also their motion to strike out paragraph VI thereof, which demurrer and motion the court ordered filed. At a later date, March 12, 1943, the court sustained plaintiffs' motion to strike out paragraph VI of the answer aforesaid, and said answer was amended accordingly. The court then overruled plaintiffs' demurrer to the said answer, as the same was amended by the court, and upon the joint application of the parties to the suit, and upon its own motion, certified to this Court the questions arising upon the demurrer and motion of the plaintiffs aforesaid, and on this record we docketed the cause.

Paragraph VI of the answer filed as aforesaid alleges, in effect, that as early as 1851, Alexander M. Bruen began the conveyance of tracts of land out of what is known as the Sheba tract, a large tract of approximately 47,000 acres then owned by said Bruen; that from time to time he executed a large number of deeds, many of which contained the identical reservation as that involved in this suit; that grantees therein had assumed to own the oil and gas in lands conveyed by deeds containing such reservation, and had leased and otherwise disposed of the same as their property; that developments, involving large expenditures of money, had resulted, of which the plaintiffs had both constructive and actual notice, over a period of many years; and that until the institution of the pending suit the said plaintiffs had neither attempted to interfere with such development and expenditures, nor asserted claims to the oil and gas so developed. By reason of what the respondents refer to as "the inexcusable and unexplained delay, inaction and inactivity on the part of the plaintiffs over a period of many years and in not long since asserting their purported claim to the oil and gas underlying the tract of land here in-

volved and other similarly affected" they plead laches against the plaintiffs' claim.

The trial court having held that the reservation contained in the Bruen-Thaxton deed was unambiguous, we are of the opinion that paragraph VI had no proper bearing on the question at issue, and the action of the court below in striking the same from the said answer is affirmed.

The order of the court below in overruling the demurrer to the answer of the respondents contains the following:

> "The Court is further of the opinion, and it is accordingly adjudged, ordered and decreed, that the terminology of the reservation contained in said deed (referring to the Bruen-Thaxton deed) and above set forth connotes the plain, explicit and commonly accepted understanding of the words 'coal and iron minerals' and no more and no less, and that there is no uncertainty which requires resort to any rule of construction other than the consideration of the phrase itself, and accordingly the Court is of the opinion that the oil and gas mineral interests were not reserved to the grantor in said deed but passed to the grantee therein."

The questions certified, arising on plaintiffs' demurrer to the answer filed, and amended by the court are:

> "*First.* Said answer presents no defense to the claim for equitable relief set forth in the bill of complaint.
>
> "*Second.* On the basis of the facts alleged in said bill of complaint and admitted to be true by said answer, none of the defendants has any title to or interest in the oil and gas underlying the tract of 125 acres described in the bill of complaint and exhibits in this suit.
>
> "*Third.* On the basis of the facts alleged in the bill of complaint and admitted to be true by said answer, the plaintiffs are the owners of all of the oil and gas underlying the tract of 125 acres described in the bill of complaint and exhibits therewith, and consequently the deeds and leases under which the defendants in this suit claim the

> title to or the right to develop said tract for oil
> and gas purposes are clouds upon the title of the
> plaintiffs."

A reading of the Bruen-Thaxton deeds makes it perfectly clear that Bruen did not intend to except and reserve all of the minerals in the land he conveyed. Had he so intended, he would have reserved the minerals without qualifying-words. We think it clear that in 1854 the word "minerals" would have been construed to include coal, oil, gas, iron and all other substances, liquids or gases, partaking of mineral qualities underneath the earth's surface. It was so interpreted by this Court in *Waugh* v. *Thompson Land & Coal Company*, 103 W. Va. 567, 137 S. E. 895, where a reservation of "all veines of Coal & Minerals" in a deed executed in 1859, was held to include oil and gas. Other cases which uphold this construction are *Sult* v. *Hochstetter Oil Company*, 63 W. Va. 317, 61 S. E. 307; *Horse Creek Land & Mining Company* v. *Midkiff*, 81 W. Va. 616, 95 S. E. 26; *Rock House Fork Land Company* v. *Raleigh Brick & Tile Company*, 83 W. Va. 20, 97 S. E. 684; *Norman* v. *Lewis*, 100 W. Va. 429, 130 S. E. 913; and *Burdette* v. *Bruen*, 118 W. Va. 624, 191 S. E. 360. All of these cases were, of course, decided subsequent to the date of the deed from Bruen to Thaxton, but, we think, even at that date, the word had a well defined meaning and, as we understand, the same meaning now recognized as attached thereto. Bruen, being a dealer in real estate, will be assumed to have understood the current meaning of the words he used, when, in the sale of his land, he used different words, phrases and methods to except, reserve or option various types of minerals. We hold, therefore, that when, in the Thaxton deed, he excepted and reserved "all the coal and iron minerals", he intended to limit the reservation he made to the particular class of minerals mentioned, otherwise he would have used the word "minerals" which would have included all mineral substances in the land.

Counsel for the litigants are in apparent agreement on

this: That in the phrase, "all the coal and iron minerals" the words "coal" and "iron" qualify the word "minerals". This can be done. *Murphy* v. *Vanvoorhis,* 94 W. Va. 475, 119 S. E. 297. We hold that it was done in the deed under consideration. We discard, as untenable, the suggestion that the word "iron" only qualified "minerals". This being true, what Bruen reserved was, in legal effect, the "coal minerals" and the "iron minerals". All minerals not coming within these classifications passed to Thaxton. We are not here concerned with the iron minerals. The question we must answer is whether or not a reservation in a deed of what we have termed "coal minerals" includes oil and gas; and, specifically, and to further narrow the ·question, whether it would have been interpreted as including oil and gas in the year 1854, the date of the Bruen-Thaxton deed.

We narrow the question, as indicated above, for the reason that we do not understand the plaintiff to contend that if the reservation contained in the Bruen-Thaxton deed were contained in a deed of today, a claim by grantor to the oil and gas could be sustained. We think it certain that it could not be. Whatever holding might have been made on the question in 1854, there has developed in the succeeding years a clear distinction between coal and other types of minerals, such as oil and gas. No one would contend today that a conveyance of coal or "coal minerals" would include oil and gas; and, of course, a reservation would be governed by the same rule. We doubt if any decision will be found expressly recognizing this distinction. *Dolan* v. *Dolan,* 70 W. Va. 76, 73 S. E. 90; and *Ramage* v. *South Penn Oil Company,* 94 W. Va. 81, 118 S. E. 162, may do so indirectly, but as we read those cases they refer, in the main, to the meaning to be given to a conveyance, devise or reservation of the surface of land, as applied to various types of mineral therein, and as governed by such provisions in the paper being construed. The wide and general meaning of the word "coal", evidenced by its conveyance as separate from any other, and

from the great number of cases dealing with that mineral, considered along with a probably greater number of cases dealing with oil and gas, separately from coal, excludes any thought that a conveyance or reservation of coal only includes any other mineral. And we think the same principle would apply as to the conveyance of "coal minerals", although that term is broader than the word "coal", and would probably include peat and lignite. While oil and gas are, along with coal, understood to be, chemically speaking, members of the carbon family, no one now considers them, in a legal sense, as having such similarity as to require that the conveyance of one should be considered as the conveyance of the other. Therefore, if the reservation is to be interpreted in the light of the modern understanding of what coal or "coal minerals" mean, the plaintiffs have no standing in court.

If we are correct in our understanding that the plaintiffs make this concession with respect to the interpretation which under modern standards should be given to the reservation in question, this does not detract, in any degree, from their contention that in 1854, the date of the Bruen-Thaxton deed, an entirely different legal construction and interpretation would have been placed thereon. Their position, as we understand it, amounts to this: That at that date the reservation in question was made, it should and would have been construed to mean, first, that certain minerals were intended to be reserved; second, that the words "coal and iron" were intended to qualify the word "minerals"; third, that the reservation meant, in legal effect, that the "coal minerals" and the "iron minerals" were reserved; fourth, that "coal minerals" meant all minerals of the chemical type such as lignite, peat, petroleum and natural gas; and fifth, that this being true the reservation in question should now be interpreted in the light of the surroundings of the parties thereto and the meaning of the words employed, as of that date. They further contend that the conveyance made by Robert Thaxton on Jauuary 3, 1880, wherein he stated "the min-

erals are reserved to A. M. Bruen", should be construed, not as adding anything to the reservation made by Bruen, but as evidence of his, Thaxton's, understanding of what the reservation actually made was intended to cover. We do not understand the plaintiff to contend that there is any patent ambiguity in the reservation contained in the Bruen-Thaxton deed. Apparently they contend that, while the language employed therein is clear, it has a meaning different from that contended for by the defendants. On this contention issue is joined between them and the defendants who answered. Therefore, the sole question is presented: What was the reservation intended to mean at the time it was made?

There being no patent ambiguity in the reservation, and no latent ambiguity alleged in the bill, there would seem to be no place for the application of rules of interpretation and construction, such as might be applied to an ambiguous writing. "If the language of a written agreement is on its face ambiguous, the court will look at the surrounding circumstances, at the situation of the parties and the subject-matter of the contract, and at acts done by the parties under it, for aid in giving a construction to its language, but not the verbal declaration of the parties." *Heatherly* v. *Bank*, 31 W. Va. 70, 5 S. E. 754. But where no ambiguity exists, a deed or other contract will be construed from the language used therein. *Griffin* v. *Fairmont Coal Company*, 59 W. Va. 480, 53 S. E. 24; *Garrett* v. *Patton*, 81 W. Va. 771, 95 S. E. 437; *Continental Coal Company* v. *Connellsville By-Product Coal Company,* 104 W. Va. 44, 138 S. E. 737; *Strother* v. *Bank*, 113 W. Va. 75, 166 S. E. 818; *Kennard* v. *Travelers Protection Assn.*, 157 Va. 153, 160 S. E. 38; *Country Club* v. *Wilkins*, 166 Va. 325, 186 S. E. 23; *Krikorian* v. *Dailey*, 171 Va. 16, 197 S. E. 442; *Williams Pocahontas Coal Co.* v. *Berwind Land Co.*, 76 Fed. 2d 319; *Lincoln Nat. Life Ins. Co.* v. *Bastian*, 31 Fed. 2d 859. The duty of courts to attempt to arrive at the intention of the parties is clear. See Virginia and West Virginia Digest, Volume 2, page 896, for cases cited on

this point. In such case the intention of the parties must be determined by giving to the language employed its plain and ordinary meaning. "It is the safest and best mode of construction to give words, free from ambiguity, their plain and ordinary meaning." *Williams* v. *South Penn Oil Company,* 52 W. Va. 181, 43 S. E. 214. This rule is modified where, by usage of trade, or otherwise, in respect to a particular subject matter, words have acquired peculiar meaning, or unless a different meaning plainly appears to the contrary. The general rule is illustrated by *Carnegie Natural Gas Company* v. *South Penn Oil Company,* 56 W. Va. 402, 49 S. E. 548. *Hall* v. *Philadelphia Company,* 72 W. Va. 573, 78 S. E. 755. "Words omitted in an instrument, * * * which can be clearly ascertained by the context, will be supplied by the court, and the instrument, * * * will be read and treated as if the words were in it." *Harmon* v. *Howe,* 27 Gratt. 676; *Liston* v. *Jenkins,* 2 W. Va. 62, 64. But "No addition to the terms of a written contract, or transposition or modification thereof, can be made by construction, unless it has foundation in the written words of the paper or in a reasonable and fair implication arising out of such words or some provision thereof or purpose expressed by it." *Leckie* v. *Bray,* 91 W. Va. 456, 113 S. E. 746.

Giving full force and effect to the rules of construction outlined above, courts, in seeking the intention of the parties in the words used in a deed or other contract, still have the right to inquire into the circumstances surrounding its effect, if any doubt as to the proper construction thereof arises therefrom. Many cases support this statement. Virginia and West Virginia Digest, Volume 7, page 898. Where the terms of a contract are in any respect doubtful or uncertain the construction placed thereon by the parties is entitled to great weight, within the limits of law governing the construction of deeds and contracts in general. It goes without saying that the intent of the parties sought to be reached is intent existing at the time the contract was made. *Crislip* v. *Cain,* 19 W. Va. 483;

*Titchenell* v. *Jackson,* 26 W. Va. 460; *Scraggs* v. *Hill,* 37 W. Va. 706, 17 S. E. 185; *Yonker* v. *Grimm,* 101 W. Va. 711, 133 S. E. 695; *McConaughey* v. *Holt,* 102 W. Va. 290, 135 S. E. 282.

But the bill of complaint in this cause, purposely of course, does not raise any question of uncertainty or doubt as to the meaning of the reservation in question other than that which may arise from the reservation itself; and the only doubt which can possibly arise therefrom is the meaning to be attached to the phrase "coal and iron minerals" used therein. There are no allegations in the bill that the word "coal", or "coal minerals" had a meaning in 1854 different from the meaning now attached thereto. Being of the opinion that the reservation is, in itself, unambiguous, there would seem to be a lack of any ground for going beyond the deed in which it appears in reaching the intent of the parties. This being true, what the plaintiffs ask us to do is to hold, as a matter of law, that the reservation in the Bruen-Thaxton deed was a reservation of the oil and gas in the land conveyed; and we are asked to so hold without any allegation that, at the date of said deed, the words used in the reservation had a broader or different meaning than is now attached thereto. In other words, the allegations of the bill afford no basis for any construction of the reservation different from that which would be applied to a deed of this date. True, it is argued at bar, and in the briefs, by plaintiffs' counsel, that the meaning of the words was different from that they would probably be held to mean as of this date. But we are deciding this case on a demurrer to an answer, which calls for an examination of the bill of complaint; and if the bill fails to state a case the demurrer to the answer will be overruled. Ordinarily this would result in the dismissal of the bill or bill and answer, subject, of course, to the right of the plaintiffs to amend their bill if they so desired.

Counsel for the litigants cite and discuss many cases which they contend will assist the Court in the solution of

the primary question involved. We have not found them of material assistance. The cases referred to by counsel begin with *Sult* v. *Hochstetter Oil Company, supra.* In that case the clause in the deed reserving to the grantor "the right to all minerals in and under the certain tract of land" was held to include oil and gas. In *Horse Creek Land & Mining Company* v. *Midkiff, supra,* it was held that "The term 'mineral', used to describe the interest in land granted or reserved, *prima facie,* includes petroleum oil and natural gas, unless it appears that the term was employed in a more restricted sense", thus laying the foundation for the rule that the word "minerals" may be subject to restrictive words which may lessen the force and effect given to the word if used without qualifying expressions. In *Rock House Fork Land Company* v. *Raleigh Brick & Tile Company, supra,* it was held that the term "mineral" is susceptible of limitation according to the intention of the parties and in that case a reservation of all the coal and other minerals of every kind and description except oil and gas, was by reason of certain other expressions in the deed held not to include a seam of clay. In *Murphy* v. *Vanvoorhis, supra,* a reservation of all of the oil privileges in a tract of land followed by a provision giving right of access to develop said land for "minerals or petroleum oil" was held not to include natural gas. In *Norman* v. *Lewis, supra,* it was held, "A reservation in a conveyance of land of 'all minerals, coal, iron, etc.,' includes oil and gas." In *Waugh* v. *The Thompson Land & Coal Company, supra,* a reservation "of all veines of Coal & Minerals" was construed to include oil and gas. In *Jeffrey* v. *Spruce-Boone Land Company,* 112 W. Va. 360, 164 S. E. 292, a conveyance "of all the coal and mineral" was held to embrace all mineral which, of course, would include oil and natural gas. In *Prindle* v. *Baker,* 116 W. Va. 48, 178 S. E. 513, it was held that "the word 'mineral' does not have an absolute legal definition and its general acceptance may be limited by the doctrine of *ejusdem generis;* but the word *prima facie* includes petro-

leum and natural gas and will not be restricted unless the context clearly shows an intention to do so." Again the right to place restrictions upon the use of the word "mineral" is recognized. In *Burdette v. Bruen, supra,* it was held: "A provision in a deed 'excepting and reserving from this grant all the coal iron and minerals & the right to use and work the same * * * no conveyance of the same being hereby intended,' not limited or qualified by any other language in the deed, must be construed as excepting from the conveyance the oil and gas in the land conveyed thereby." In *United Fuel Gas Company v. Moles,* 122 W. Va. 577, 11 S. E. 2d 369, there was a conveyance of land by Alexander M. Bruen in 1867 from which he excepted the minerals and it was admitted by all parties to that litigation that such exception included oil and gas.

We are unable to see that any one of these cases, or all of them considered together, furnish any safe criterion for a decision of the case at bar. None of them discuss the particular reservation we have before us. These decisions rest on different types of reservation, warranting close distinction, and calling for rulings which fit the case presented. We do not discern any intention to overrule earlier decisions. Now comes along a new case, a new reservation, one not heretofore considered, requiring a ruling to meet the present case. That, and only that, accounts for the cases discussed above.

Only by an unwarranted transposition of words can any close similarity be traced between the reservation we are now considering and those involved in the cases we have discussed. This is peculiarly true as to the case of *Burdette v. Bruen, supra.* The reservation in that case was "all coal, iron and mineral". In the case at bar it is "all the coal and iron minerals". If we should transpose the conjunction "and" in the reservation at bar, and make it follow the word "iron" instead of the word "coal", we would have the same reservation as that considered in *Burdette v. Bruen.* And we would be forced to hold that the oil and gas was reserved. But can we do that?

Such a transposition, involving a most vital change in the meaning of the reservation, could only be justified where there was something in the deed, considered as a whole, imperatively calling therefor, and that something is in our opinion entirely lacking here. Seeing nothing in the deed, read as a whole, which calls for any transposing of words, it follows that the words used, giving them their plain and ordinary meaning, must be made the basis of our decision.

Nor are we aided by the suggestion that it should be presumed that Bruen must have intended to reserve the oil and gas in the land he conveyed to Thaxton, because in many other conveyances of the same Sheba tract he did reserve all minerals, or make reservation of the oil and gas, and that it is unreasonable to assume that he would reserve the minerals in one tract and not in another, his apparent general policy being to make reservation of minerals. These suggestions are answered by the fact, shown by the record, that he executed conveyances in which he made no reservation of minerals; in others he reserved specific minerals; in others he reserved all minerals; and in still others he retained perpetual or limited options to repurchase the minerals then being conveyed. What he did, in respect to reservations does not convince us that he had any settled policy. Therefore we must consider each conveyance according to its terms.

While the conveyance of the 125 acres of land by Robert Thaxton to Monroe S. Thaxton on January 3, 1880, should be considered, solely on the question of what Robert Thaxton understood to be the meaning of the reservation in the Bruen deed to him, we do not think the statement in the 1880 deed that "the minerals are reserved to A. M. Bruen" should be construed as meaning anything more than a recognition of the reservation contained in the Bruen-Thaxton deed. And the question of what minerals were, in fact, reserved by that deed was, in our opinion, left open. Unquestionably, "coal and iron minerals" were

reserved in the Bruen-Thaxton deed. Thaxton says in his deed, twenty-six years later, that "the minerals are reserved to A. M. Bruen." What minerals? We think he meant the minerals actually reserved in the first deed and what he said throws no additional light on what those minerals were. The question still remains as to the meaning of the Bruen-Thaxton reservation. *Jeffreys* v. *Land Co.*, 112 W. Va. 360, 164 S. E. 292, was a case where a landowner conveyed "all the coal and mineral" and later conveyed the land to his children and used appropriate words recognizing his conveyance of the minerals. We do not think it reaches the case at bar. The fact that subsequent conveyances of the 125 acres refer to the deed of January 3, 1880, has no bearing on the question, except that the persons making those conveyances, and those accepting them, were charged with notice of the expression contained in that deed.

There can be no denial of the scientific fact that coal lignite, peat, petroleum, and natural gas are minerals of the same chemical family. In whatever form they have developed, carbon plays a predominant part in their composition. Coal is solidified carbon. Petroleum is carbon in a semi-liquid form, and natural gas is the same chemical in the form of a gas or vapor. But it is also a fact, we think, that, from the day petroleum and natural gas were discovered and put to commercial use, they have taken the name of oil and gas as distinguished from other types of mineral of the carbon family. They have usually been associated together, both in contracts relating thereto, and in their development, for the reason that, in the matter of development, the same methods are pursued as to each. They are, as a general rule, found in the same fields of development, frequently in the same strata, and are the products of each other. Many times both oil and gas are developed in the same drilling. There was no oil or gas development on or near the Sheba tract in 1854, and it may be doubted whether either party to the Bruen-Thaxton deed gave any thought to the existence or value

of either. On the other hand, coal and iron were both used and mined at that time commercially, although probably not in the immediate vicinity of the Sheba tract. Coal, however, must have been then used for household and domestic purposes, for, under the reservation, use by the grantor of the coal, iron as well, was provided for, showing clearly that the minerals reserved were understood to be of a character that at that time could be devoted to domestic and household use. This in itself implies some restriction on the use of the word "mineral" in the Bruen-Thaxton deed, and is a circumstance akin to those under which this Court has recognized limitations in the use of the word "mineral". It is fair to say that, as a practical matter, only one of said minerals, coal, could have been used for household and domestic purposes. Certainly at that date, no one could have contemplated the use of either oil or gas for such purposes.

We are referred to definitions of the word "coal" which is usually defined as a mineral. It is said that it is "commonly used to denote all kinds of mineral fuel", and to embrace "all classes of mineral fuel", and that "the combinations of carbon hydrogen, oxygen and nitrogen * * * to which the term mineral fuel may be properly applied are infinite, ranging through all the grades of coal, from the hard, dense, anthracite, asphaltic varieties and from the solidified petroleums to the gaseous naphtha." These quotations are taken from Appleton's American Encyclopedia of 1874. A Work on Coal, Oil and Petroleums, published in 1865, is also referred to as upholding the contention that coal, oil and gas have similar qualities; and in a Work on Mineralogy and Geology, written in 1816, the connection between coal and petroleums is emphasized. Aside from these authorities we know that oil and gas may be developed from coal by chemical processes now in general use throughout the world.

But whatever influence these authorities may be entitled to, it still remains true that, speaking from a

clearly legal standpoint, and as understood in this day, coal, while a mineral, is clearly distinguishable from the kindred minerals known as oil and gas. That there is a chemical relation between these minerals is undoubted. But we do not think it will be denied that from the time oil came into commercial use in 1859 and natural gas later on, the distinction of oil and gas minerals from coal minerals has been, in a legal sense, clearly marked. When oil in substantial quantities was developed in western Pennsylvania in 1859 it immediately became of great commercial importance; and when, later, uses for natural gas were found, that mineral likewise became commercially valuable. No longer, in any legal or commercial sense was either associated with coal. And seldom was there a development of either which was in any way associated with the production of coal. Lands many times containing all three types of minerals, coal, oil and gas, were sold in which one was reserved and the other passed under the conveyance made. The reservation of one was never understood to include the other, or either of them, and large sums of money have been invested, great mineral fields have been developed, and sometimes exhausted, all on the assumption of the separation, in a legal sense, of the three minerals, and particularly the separation of oil and gas from coal. That distinction has arisen from the commercial development of the three minerals, and for more than fifty years in this State it has been recognized and acted upon by all persons engaged in the dealing with and in the development of these types of minerals. Such a situation must inevitably be given some weight. We should not be asked to accept a construction of a writing which would be to wipe out practical distinction which the development of these minerals have created over a long period of time.

Without meaning to overstress the matter, we think what we are now asked to do by the plaintiffs is, in effect, to turn back the clock eighty-nine years, and put ourselves in the place of two men who in 1854, before the

existence or commercial value of either oil or natural gas was known to the public, made a sale and purchase of land, and in the conveyance thereof the grantor reserved the coal and iron minerals which, literally construed, covered minerals which were then the subject of development and commerce, and hold that these men intended by such reservation to deal with other classes and types of mineral, not then known to be of any commercial value, if in fact they were then known to exist. We are unable to find any reasonable justification upon which we could base such a holding. If, in 1854, neither Bruen nor Thaxton knew of the existence or commercial value of oil or gas, how could either have had them in mind when they consummated their sale and purchase? If they did know, why were they not mentioned, or covered by the general term "mineral" or otherwise? We realize, of course, that a broad reservation of minerals would have included all minerals, whether their existence was or was not then known to either party to a deed or to a contract; but when a grantor makes a reservation of specific minerals, as in this case, is it not reasonable to assume that he had those special minerals in mind, and not minerals of whose existence and value he may have been wholly unaware? All this, of course, bears on what the parties to the deed intended.

Bruen is shown to have been a large landowner, and is represented as a capable business man. Being so, he must have known that a reservation of minerals, without qualifying words, would have saved to him everything of a mineral nature in the land he was conveying. Again we ask, why did he limit his reservation to the "coal and iron minerals" instead of minerals alone? His was the choice of words, he being the grantor. Are we not justified in holding that what Bruen intended was to limit his reservation to those minerals designated in the qualifying words he used?

We have no disposition to minimize or ignore the well recognized principle that, in the construction of deeds and

other contracts, the intent of the parties thereto should be carried out so far as possible under rules of law governing the same. We agree, also, that the intent existing when the writing is executed is that which is sought. Here, however, we are limited in our search for this intent to the deed itself, and that deed is clear and unambiguous. The plaintiff asks us to say that in 1854 the words "coal minerals" included oil and gas, because he says that at that time such words had a meaning which justifies them in making that request and in basing their claim of title thereon. The most that can be said in support of this theory is that there is a chemical connection between coal and oil and gas, and that certain definitions of coal prepared before and after 1854, may be construed as including within the classification of coal the kindred minerals, oil and gas. We think such definitions insufficient to justify us in holding, as a matter of law, that the phrase, "all the coal and iron minerals" would in 1854 have been construed as including oil and gas.

The world moves on, and we cannot permit the customs and usages of the past to place too much of a curb on its progress. Old ways and old expressions pass and give way to the new. Rights developed and vested in the past should be protected, but we should not permit the technical meaning of ancient words or phrases, as applied to situations then existing, to hold their place as against new terms, words and expressions brought into common use by the changing years, and the expanding development of resources not known to exist in days when such ancient expressions were used, or, if known to exist, their value and importance was not recognized. We think it may be safely asserted that the coal, the oil and the gas with which this State has been favored, has been developed, from the beginning, with a most complete understanding that they were separate and distinct minerals and that they have been dealt with as such. In the face of this situation, extending over a long period of time, we cannot bring ourselves to believe that we should permit

an expression made some eighty-nine years ago to be applied in such a way as to overturn the modern and generally recognized rules which have governed the purchase, sale, reservation and development of these minerals. Some case might be presented where we would be required, under the law, to do just that thing; but we do not think the circumstances of the case before us require any such ruling.

We think the construction placed by the lower court upon the reservation contained in the Bruen-Thaxton deed should be upheld, and that such construction required the overruling of the plaintiffs' demurrer to the answer filed by the defendants, Ziebold, United Fuel Gas Company and United Carbon Company. The ruling of the lower court is therefore affirmed.

*Affirmed.*

KENNA, JUDGE, concurring:

I am in full agreement with the conclusion reached by the majority of the Court, but, without questioning the accuracy of the result, I am not in harmony with the majority's method of treatment and think that what is, to my mind, a much simpler and more direct process can be used to reach the same end.

It is well settled in this State that in giving effect to a conveyance or deed, the intention of the parties is the governing and controlling principle for the courts to apply. We have a controlling statute. Code, 36-3-4. That being true, the meaning of the words and phrases used is to be inquired into and fixed according to the current usage at the time the instrument was executed. Otherwise, in many instances, the effect of a written instrument would undergo continual alteration, and would have no permanence. In order to apply that rule it is not necessary that the instrument contain a possible double meaning. We are not, here, engaged in construing an ambiguity. Our inquiry is simply to arrive at the ex-

pressed intention of the parties. I therefore agree with the contention of the appellant that the phrase contained in the reservation under consideration, "coal and iron minerals", is to be read in the light of its meaning at the time of the execution and delivery of the Bruen deed to the grantee, Thaxton, or in the year 1854. See *Chapman* v. *Mill Creek Coal and Coke Co.*, 54 W. Va. 193, 196, 46 S. E. 262. Further, the known circumstances surrounding the parties at that time as shown by authoritative local history are to be considered without allegation and proof thereof.

The question to be determined is: What did the seller intend to retain and what did the buyer know he was not purchasing at the time of the deed?

Since in 1854 both coal and iron were thought to underlie this section in commercially paying quantities, there, of course, is no doubt that the reservation was intended to include them, and all of the kindred natural resources which preceded both in point of development. But it is equally clear that some minerals were to pass by virtue of the granting clause in the Bruen deed. Otherwise the reservation would not have been limited to coal and iron minerals. The logical result is that all minerals not specifically covered by the reservation were intended to pass to the grantee. Certainly that is true of all minerals known then to be of commercial use. That can be determined by taking judicial notice of the commonly known and uncontroverted local history as stated in John P. Hale's "Trans-Allegheny Pioneers" and in "West Virginia Handbook" of 1870 compiled by our then Commissioner of Immigration.

Petroleum or oil had then been known for centuries as a lubricant and was generally known to underlie this section to such an extent that the Kanawha River became popularly called "Old Greasy", due to the quantity of oil discovered, but not saved, in drilling salt wells. Natural gas had been known for many years and it had been drilled for and found as a frequent incident in connection

with the salt industry for the purpose of using 'its rock pressure underlying the salt brine to force the brine to the surface, and for the further purpose of using it as fuel in salt furnaces. In my opinion there can be no doubt that at the date of the deed under consideration the average person in this community knew of the commercial use of coal, iron, oil and gas and also knew that they underlay the surface in supposedly usable quantities. That being so it follows as a matter of course that the reservation contained in the deed now before the Court includes only the known minerals expressly specified, and excludes at least the then known minerals not expressly named.

I believe also that the foregoing viewpoint expressed touches on the generally recognized principle that the law favors the vesting of estates and therefore disfavors the splitting of fee ownership and for this reason reservations are to be strictly construed. *Adkins* v. *Huff*, 58 W. Va. 645, 650, 52 S. E. 773, 3 L. R. A. (N. S.) 649; *Chapman* v. *Mill Creek Coal and Coke Co.*, 54 W. Va. 193, 196, 46 S. E. 262. This rule of construction is, of course, not to be confused with that to the effect that *in case of doubt* the language of a deed is to operate against the interest of the grantor. To bring the last stated rule into play requires a balanced meaning, the rule simply tipping the balance. Here we have not reached that point, but are striving to determine the intention of the parties in order to *avoid* doubtful meanings.

We are urged by the appellant to consider the fact that Bruen would not have intended, as the owner of the fee, to have divided a tract of approximately forty-seven thousand acres "through unnecessarily variant reservations" into estates of different kinds. That is exactly what Bruen did. Some of his "outsales" had no mineral reservations of any sort. Others, as is shown by this record, contained reservations differently worded in at least a dozen ways, so that there was no over-all standard adopted nor followed by Bruen. Under those conditions the courts will not create nor impose their own standards. To my

mind, it does not strengthen appellant's position to so urge.

We are also urged to consider the subsequent deeds beginning with that of Bruen's immediate grantee, as placing a practical construction upon the meaning of the language used by Bruen in 1854. Of course, at best from the standpoint of appellant, this can be done only in order to resolve an ambiguity. If there is an ambiguity, the first principle to be followed is to construe the instrument as against the interest of the grantor, and even with the concession that there is an ambiguity, in my opinion, the solution would be reached under admitted methods of construction considerably before applying the extremely attenuated idea that the course of conduct followed by one party to a bilateral contract can be accepted as disclosing an effective meeting of minds (note the plural) in which process he could, without the participation of Bruen, represent one side only. Bruen's practical interpretation might be said to rest upon his long delayed assertion of ownership.

Citing 17 Corpus Juris Secundum at page 724, Page on Contracts and Elliott on Contracts as authority for the transposing of words in a written contract to arrive at the intention of the parties, the appellant asserts that by transposing the word "and" the reservation before us would be made to read, "all coal and iron and minerals". It will be noted that adopting that reading is not simply altering the structure of the same wording, but involves the supplying of an additional word, "and". I do not believe that the method suggested is sustained by the text citations used because it is not a transposition. It is an interpolation of the word "and", a practice which is rarely, and only in extremely clear cases, permitted by the courts.

It is rather difficult to apply the holdings in recent cases in this jurisdiction having to do with the meaning of the word "minerals" and at the same time to reason that the correct way to reach the sense of language is

to read it in the light of the meaning when used. The difficulty is increased by the fact that in the decided cases the language is not the same and the further fact that the cases we are asked to apply, in effect, overrule previous cases the effective date of which more nearly coincides in point of time with the year 1854. The decisions of the courts fixing the meaning of words as used in different instruments at different times cannot be binding, although persuasive, when it comes to fixing the meaning of a paper executed by different parties under different circumstances and at different times. If we were dealing with words used in a scientific sense, the meaning of which is to remain permanent if possible, the rule stated in the first point of the syllabus would apply. But we are not. We are here dealing with words of art as distinguished from scientific terms. Such must be viewed with the knowledge that they are subject to continual change and the courts should not attempt to fix their meaning as a matter of law. To my mind, it is an extremely refined abstraction to be guided by the common usage in 1854 for the meaning of the words used in this reservation and for the same purpose to be bound by implied reversals in opinions of this Court announced in 1937.

It will be seen from the foregoing that I am not in agreement with a number of statements in, and inferences to be drawn from, the majority opinion, among which are: that oil and gas were unknown in this area in 1854; that the rule relating to ancient documents is used other than as a rule of evidence; and that there must be a special showing of intention to do so by the parties to the instrument before the courts will apply to the words used in the instrument the meaning which attached to them at the time of their use. I am of opinion that the exact contrary of the rule last stated is well sustained by the decided cases and that if a different meaning from that at the time of submission can be shown by well recognized authority, or by the historic circumstances surrounding the parties at the date of the instrument, the

courts, if urged to do so, will take judicial notice of it. In addition, I fear that the wording of the first point in the syllabus may lead to it being misunderstood.

As stated, I agree with the Court's conclusion.